## AMERICAN SURETY COMPANY *v.* PAULY (No. 1).

ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 168. Argued January 6, 7, 1898. — Decided April 18, 1898.

In an action against the maker of a bond, given to indemnify or insure a bank against loss arising from acts of fraud or dishonesty on the part of its cashier, if the bond was fairly and reasonably susceptible of two constructions, one favorable to the bank and the other to the insurer, the former, if consistent with the objects for which the bond was given, must be adopted.

Under the condition of the bond in this case, requiring notice of acts of fraud or dishonesty, the defendant was entitled to notice in writing of any act of the cashier which came to the knowledge of the plaintiff of a fraudulent or a dishonest character as soon as practicable after the plaintiff acquired knowledge; and it is not sufficient to defeat the plaintiff's right of action upon the policy to show that the plaintiff may have had suspicions of dishonest conduct of the cashier; but it was plaintiff's duty, when it came to his knowledge, when he was satisfied that the cashier had committed acts of dishonesty or fraud likely to involve loss to the defendant under the bond, as soon as was practicable thereafter to give written notice to the defendant: though he may have had suspicions of irregularities or fraud, he was not bound to act until he had acquired knowledge of some specific fraudulent or dishonest act that might involve the defendant in liability for the misconduct.

When the bank suspended business, and the investigation by the examiner commenced, O'Brien ceased to perform the ordinary duties of a cashier; but within the meaning of the bond, he did not retire from, but remained in, the service of the employer during at least the investigation of the bank's affairs and the custody of its assets by the national bank examiner, which lasted until the appointment of a receiver and his qualification. *Held,* that the six months from "the death or dismissal or retirement of the employé from the service of the employer," within which

his fraud or dishonesty must have been discovered in order to hold the company liable, did not commence to run prior to the date last named.

The making of a statement as to the honesty and fidelity of an employé of a bank for the benefit of the employé, and to enable the latter to obtain a bond insuring his fidelity, was no part of the ordinary routine business of a bank president, and there was nothing to show that by any usage of this particular bank such function was committed to its president.

The presumption that an agent informs his principal of that which his duty and the interests of his principal require him to communicate does not arise where the agent acts or makes declarations not in execution of any duty that he owes to the principal, nor within any authority possessed by him, but to subserve simply his own personal ends or to commit some fraud against the principal; and in such cases, the principal is not bound by the acts or declarations of the agent unless it be proved that he had at the time actual notice of them, or having received notice of them, failed to disavow what was assumed to be said and done in his behalf.

When an agent has, in the course of his employment, been guilty of an actual fraud contrived and carried out for his own benefit, by which he intended to defraud and did defraud his own principal or client, as well as perhaps the other party, and the very perpetration of such fraud involved the necessity of his concealing the facts from his own client, then under such circumstances the principal is not charged with constructive notice of facts known by the attorney and thus fraudulently concealed.

THE case is stated in the opinion.

*Mr. Henry C. Willcox* and *Mr. Walter D. Davidge* for plaintiff in error. *Mr. Walter D. Davidge, Jr.*, was on their brief.

*Mr. Edward Winslow Paige* for defendant in error.

MR. JUSTICE HARLAN delivered the opinion of the court.

The defendant in error as receiver of the California National Bank of San Diego, California, brought this action against the plaintiff in error, a corporation of New York, upon a bond of the latter for $15,000 guaranteeing or insuring the bank, subject to certain conditions, against any act of fraud or dishonesty committed by George N. O'Brien in his position as cashier of that institution.

This bond was based upon an application by O'Brien to the Surety Company accompanied by written declarations and

answers to questions relating to his age, history, habits, financial condition, etc. He presented with the application the following certificate, signed by J. W. Collins as president of the bank: "I have read the foregoing declarations and answers made by George N. O'Brien, and believe them to be true. He has been in the employ of this bank during three years; and to the best of my knowledge has always performed his duties in a faithful and satisfactory manner. His accounts were last examined on the 28th day of March, 1891, and found correct in every respect. He is not to my knowledge, at present, in arrears or in default. I know nothing of his habits or antecedents affecting his title to general confidence, or why the bond he applies for should not be granted to him."

The bond was executed July 1, 1891. After reciting that the employé, O'Brien, had been appointed in the service of the employer, the bank, had been assigned to the office or position of cashier, and had applied to the American Surety Company of New York for a bond, it provided:

"Now, therefore, in consideration of the sum of seventy-five dollars, lawful money of the United States of America, in hand paid to the company, as a premium for the term of twelve months ending on the first day of July, one thousand eight hundred and ninety-two, at 12 o'clock noon, it is hereby declared and agreed that, subject to the provision herein contained, the company shall, within three months next after notice, accompanied by satisfactory proof, of a loss, as hereinafter mentioned, has been given to the company, make good and reimburse to the employer all and any pecuniary loss sustained by the employer, of moneys, securities or other personal property in the possession of the employé, or for the possession of which he is responsible, by any act of fraud, or dishonesty, on the part of the employé, in connection with the duties of the office or position hereinbefore referred to, or the duties to which in the employer's service he may be subsequently appointed, and occurring during the continuance of this bond, and discovered during said continuance, or within six months thereafter, and within six months from the death or dismissal, or retirement of the employé, from the service of

the employer. It being understood that a written statement of such loss, certified by the duly authorized officer or representative of the employer, and based upon the accounts of the employer, shall be *prima facie* evidence thereof. Provided always, that the company shall not be liable, by virtue of this bond, for any mere error of judgment or injudicious exercise of discretion on the part of the employé, in and about all or any matters, wherein he shall have been vested with discretion, either by instruction, or rules and regulations of the employer. And it is expressly understood and agreed that the company shall in no way be held liable hereunder to make good any loss which may accrue to the employer by reason of any act or thing done, or left undone, by the employé, in obedience to, or in pursuance of, any direction, instruction or authorization conveyed to and received by him from the employer or its duly authorized officer in that behalf; and it is expressly understood and agreed that the company shall in no way be held liable hereunder to make good any loss, by robbery or otherwise, that the employer may sustain, except by the direct act or connivance of the employé.

" The following provisions are to be observed and binding as a part of this bond:

" That the company shall be notified in writing, at its office in the city of New York, of any act on the part of the employé, which may involve a loss for which the company is responsible hereunder, as soon as practicable after the occurrence of such act shall have come to the knowledge of the employer. That any claim made in respect of this bond shall be in writing, addressed to the company, as aforesaid, as soon as practicable after the discovery of any loss for which the company is responsible hereunder, and within six months after the expiration or cancellation of this bond as aforesaid. And upon the making of such claim, this bond shall wholly cease and determine as regards any liability for any act or omission of the employé committed subsequent to the making of such claim, and shall be surrendered to the company on payment of such claim."

"That if the company shall so elect, this bond may be cancelled at any time by giving one month's notice to the employer, and refunding the premium paid, less a *pro rata* part thereof for the time said bond shall have been in force, remaining liable for all or any default covered by this bond, which may have been committed by the employé, up to the date of such determination, and discovered and notified to the company within the limit of time hereinbefore provided for.

"That the employer shall, if required by the company, and as soon thereafter as it can reasonably be done, give all such aid and information as may be possible (at the cost and expense of the company), for the purpose of prosecuting and bringing the employé to justice, or for aiding the company in suing for and making effort to obtain reimbursement by the employé or his estate, of any moneys which the company shall have paid or become liable to pay by virtue of this bond.

"That no suit or proceeding at law or in equity shall be brought to recover any sum hereby insured, unless the same is commenced within one year from the time of the making of any claim on the company."

"It is further agreed that this bond may at the option of the employer be continued in force from year to year at the same premium rate as long as the company shall consent to receive the same, in which case the company shall remain liable for any dishonest act of the employé occurring between the original date of this bond and the time to which it shall have been continued."

On the application of Collins, a bond, with like conditions, was made the same day by the Surety Company in the penalty of $25,000 guaranteeing the bank against loss by any act of fraud or dishonesty on his part as its president.

The complaint set out certain acts of fraud and dishonesty by O'Brien in his office of cashier whereby, it was alleged, the bank lost an amount in excess of that named in the bond. All the material allegations of the complaint were denied by the answer. The result of the trial was a judgment in favor of the plaintiff for $16,847.50, which was the amount of the

bond with interest.; also for $385.73 costs and $202.16 interest on the verdict; in all, $17,435.39. That judgment was affirmed in the Circuit Court of Appeals. 38 U. S. App. 254.

Upon certain issues in the case there was a decided conflict in the evidence, particularly as to the time when the receiver first discovered that O'Brien as cashier had committed an act that might involve a loss for which the Surety Company would be liable and of which it was entitled to be notified in writing as soon as practicable after the occurrence of such act came to the knowledge of the bank.

In view, however, of the verdict, and assuming that the jury had due regard to the instructions of the court, the following facts may be regarded as established by the evidence:

On the 13th and 14th days of October, 1891, O'Brien, being cashier, fraudulently and dishonestly placed to the credit of Collins, the president of the bank, two sums, $20,000 and $24,500.

The bank suspended business on the 12th day of November, 1891, at which time Collins had to his credit on its books only $11,420.90. Of the above sums aggregating $44,500 falsely credited to him, he drew out, on his own checks, $33,029.10, which was wholly lost to the bank.

Immediately upon the suspension of the bank an examiner appointed by the Comptroller of the Currency, Rev. Stat. § 5240, entered upon an investigation of its affairs.

On the 18th day of December, 1891, Pauly was appointed receiver, Rev. Stat. §§ 5205, 5234, and having qualified as such, took possession on the 29th day of December, 1891, of the books, papers and assets of the bank — continuing its employés in his service for a short time.

O'Brien remained in service under the receiver until about March 2, 1892, when he left, because the receiver declined to pay his salary — the latter saying that he would regard it as credited or paid on any indebtedness of O'Brien's to the bank.

During January, February and March, 1892, there was a general examination of the books of the bank under the direction of the receiver. And about April 1, 1892, one Bloodgood, an expert bookkeeper, in connection with another

bookkeeper, entered upon a particular examination of such books, with a view of ascertaining the transactions of Collins while he was president. Collins died March 3, 1892. Towards the end of May these experts made certain discoveries involving the fidelity and integrity of O'Brien as cashier, of which Bloodgood gave notice to the receiver. The facts thus discovered related to the false credits which, as above stated, O'Brien as cashier had given to Collins on the books of the bank.

It is to be taken upon this record, after the verdict of the jury, that although the general examination of the bank's books in January, February and March, 1892, indicated that there were probably irregularities in the conduct of the bank's business, the receiver was not aware of "the amounts and special conditions" of such irregularities nor of any specific act of fraud or dishonesty upon the part of the cashier, until the expert bookkeepers had completed their examination of the books of the bank about May 23, 1892, on which day the receiver wrote to the Surety Company, giving notice of the discovery of fraud that entitled him as receiver to look to that company upon its bonds for the fidelity and integrity of Collins and O'Brien. That letter was as follows: "I write to notify you that the California National Bank held a bond to the amount of $20,000 in its favor for the faithful performance of duties by J. W. Collins, its late president, also in favor for the faithful performance of duties by George N. O'Brien, its cashier, for $15,000. I therefore notify you that a discovery of fraud has been made of sufficient amount to require the payment of those indemnity bonds to the undersigned receiver of the California National Bank. I therefore ask that you forward us the necessary blanks to make the claim or claims in proper form."

This letter appears to be undated, but the time is shown by the following letter, dated May 31, and addressed by the vice president of the Surety Company to the receiver: "We are this morning in receipt of your letter of the 23d inst., stating that you have discovered fraud on the part of J. W. Collins, late president of the California National Bank, and on the

part of George N. O'Brien, late cashier of said bank, suffi-
cient to require payment by this company under bonds- here-
tofore issued upon the parties named in favor of the said
California National Bank. I transmit herewith two claim
blanks with three continuation sheets with each, upon which
please itemize any claim you may have to present under the
bond of J. W. Collins; also upon the bonds of George N.
O'Brien; showing the precise dates of alleged embezzlements
on the part of said John W. Collins and said George N.
O'Brien; and the amounts thereof; after which please attest
the same under oath and transmit to this office, furnishing
to our inspector, Mr. Bradbury Williams, who will call upon
you, a duplicate statement of the items, with the dates thereto
attached, so that he may be able to verify the account. Will
you also please inform me where George N. O'Brien is at
present, and whether you have made a formal demand upon
him for the amount alleged to be due and whether he has
refused to pay the same; also the date of said demand; and
if made in writing will you please send us a copy of said
demand and furnish a copy to our inspector, Mr. Bradbury
Williams. We desire to have you perfect your claims with
the utmost expedition, and when received they will be duly
considered."

Under date of June 24, 1892, the receiver wrote to the vice
president of the Surety Company: "In reply to yours of the
31st ult., I hand you herewith two affidavits in regard to the
embezzlement of the late J. W. Collins and George N. O'Brien,
furnished after consultation with my legal adviser, as giving
information fuller than I otherwise could do by using the
blank sent me in your favor of above date. Mr. G. N.
O'Brien is still living in San Diego City. A formal demand
was made-upon him in writing for the amounts embezzled by
his aid- and assistance from the California National Bank, to
which he has as yet made no reply. The affidavit herein
relative to J. W. Collins includes an item of $10,000 discov-
ered after making the affidavit sent you before. Duplicate
affidavits and copy of the demand made upon G. N. O'Brien
will be furnished your Mr. Bradbury Williams when he calls.

Trusting you will find this statement explicit enough for your purpose, and that we may in the near future receive payment as required under the bonds that should guarantee the California National Bank against loss on the part of the hereinbefore mentioned J. W. Collins and George N. O'Brien."

The questions of law presented for consideration will be better understood if the following additional facts be stated:

With the above letter of June 24, 1892, was an affidavit of the receiver called in the record "Proof of Claim." That document stated among other things that on the 13th and 14th days of October, 1891, O'Brien, as cashier, made entries of the deposit tags, and caused to be entered in the books of the bank credits in favor of Collins amounting to forty-five thousand dollars without Collins paying any consideration therefor, and without being entitled thereto, as O'Brien well knew; that the nature, extent, amount and circumstances connected with these wrongful acts of O'Brien had come to the knowledge of the receiver and of the bank since the first day of February, 1892; that O'Brien was not entitled to any credits, and the bank was not indebted to him in any sum; that at the date of the suspension of the bank his account was overdrawn, and he was at that date indebted to the bank; that the above statements as to his wrongful, unlawful and fraudulent acts as cashier of the bank between the first of July, 1891, and the 12th day of November, 1891, the last date being the date of the suspension of the bank, included all the money misappropriated, wrongful and improper entries and fraudulent and wrongful conduct upon the part of O'Brien that had come to the knowledge of the receiver, and constituted a true and correct statement of the account between him and the bank.

On the same day, June 24, 1892, the receiver mailed to the Surety Company a written notice containing substantially the same statements as were contained in the above affidavit, and concluding: "That in pursuance of a certain bond numbered 85,565, heretofore issued by your company, in which you agree to make good and reimburse the said California National Bank of San Diego all and any pecuniary loss sustained during the

continuance of the bond on account of the fraud or dishonesty of the said G. N. O'Brien, after a written statement of said loss is presented, this notice is given by the undersigned, Frederick N. Pauly, receiver of the California National Bank of San Diego, appointed such receiver December 18, 1891, by the Comptroller of the Currency of the United States, and attached hereto is a statement of the loss, duly certified by the said receiver, now representative of said employer named in said bond; that said George N. O'Brien is insolvent; that demand in writing has been made upon him that he reimburse and repay to said bank the amounts; hereinbefore dishonestly and fraudulently obtained of said bank, which he has refused to do. This notice is given you as soon as practicable after the occurrence of the wrongful acts hereinbefore referred to and demand is hereby made upon you by the undersigned, as representative of said bank and as such receiver, for the sum of fifteen thousand dollars ($15,000), the amount in said bond stipulated."

On the 8th day of July, 1892, the Surety Company addressed to the receiver the following letter: "We are in receipt of your two letters of the 24th ultimo, transmitting two affidavits relative to the claim under the bonds of this company to the California National Bank for J. W. Collins and George N. O'Brien in the respective positions of president and cashier of said bank. We have respectfully to request that you will make a statement of each on the claim forms which we use for that purpose, two of which are herewith enclosed. We desire full information in regard to the shortages and credits, of every kind whatever, whether on account of salary due, money paid or assignments made by either of said persons to the California National Bank. If there has been any action brought against Mr. George N. O'Brien, or any correspondence between the bank or you with either of the persons in regard to the matter, we should be pleased to have copies thereof."

To this letter the receiver, under date of July 18, 1892, made the following reply: "In reply to yours of 8th instant relative to my claim under the bonds of your company to the

California National Bank for J. W. Collins and G. N. O'Brien, I beg to herewith send you a statement of account of J. W. Collins, showing the amount of his deficiency to be $374,978.22. A list of the property assigned by J. W. Collins to the California National Bank with the estimation of the value thereof. J. W. Collins under the name of Dare & Collins is a defaulter to the bank in the sum of $348,703.52 in addition to the amount above stated. An itemized statement of the account can also be forwarded you if desired. With regard to G. N. O'Brien, no action has been brought against him, because he is execution proof. In reply to my demand for payment for the amounts embezzled by J. W. Collins during the term covered by these bonds, he replied as per copy of his letter herewith enclosed. In compliance with the request of the U. S. Attorney I appeared before the grand jury and testified as to the state of facts that existed implicating G. N. O'Brien in the defalcations with J. W. Collins. What action the grand jury will take has not yet transpired. Trusting that these statements will meet your requirements, I am, etc."

Other letters passed between the receiver and the company, in respect to which it is only necessary to observe that the company retained the proofs of loss sent to it without objecting that they did not sufficiently indicate the nature and extent of the claim made by the receiver. Finally, the receiver, writing to the vice president of the company, under date of September 21, 1892, said: "There has been so much delay in this matter that I have placed it, under the direction of the Comptroller, in the hands of the U. S. Attorney in New York, Edward Mitchell, Esq., with instructions to collect the same." The company in reply expressed their gratification that when taking up the matter finally it could deal with the United States in New York on the merits of the case.

In the light of the facts, as above stated, we come to the consideration of the controlling questions of law presented for determination. These questions depend largely upon the interpretation to be given to the provisions of the bond in suit.

If, looking at all its provisions, the bond is fairly and reasonably susceptible of two constructions, one favorable to the bank and the other favorable to the Surety Company, the former, if consistent with the objects for which the bond was given, must be adopted, and this for the reason that the instrument which the court is invited to interpret was drawn by the attorneys, officers or agents of the Surety Company. This is a well established rule in the law of insurance. *National Bank* v. *Insurance Co.*, 95 U. S. 673 ; *Western Ins. Co.* v. *Cropper*, 32 Penn. St. 351, 355 ; *Reynolds* v. *Commerce Fire Ins. Co.*, 47 N. Y. 597, 604 ; *Travellers' Ins. Co.* v. *McConkey*, 127 U. S. 661, 666 ; *Fowkes* v. *Manchester &c. Life Ass'n*, 3 Best & Smith, 917, 925. As said by Lord St. Leonards in *Anderson* v. *Fitzgerald*, 4 H. L. Cas. *484, *507, " it [a life policy] is of course prepared by the company, and if therefore there should be any ambiguity in it, must be taken, according to law, most strongly against the person who prepared it." There is no sound reason why this rule should not be applied in the present case. The object of the bond in suit was to indemnify or insure the bank against loss arising from any act of fraud or dishonesty on the part of O'Brien in connection with his duties as cashier, or with the duties to which in the employer's service he might be subsequently appointed. That object should not be defeated by any narrow interpretation of its provisions, nor by adopting a construction favorable to the company if there be another construction equally admissible under the terms of the instrument executed for the protection of the bank.

It was contended in the court below, as it is here, that the receiver did not comply with that provision of the bond requiring written notice to be given to the company, at its office in New York, of any act on the part of O'Brien " which may involve a loss for which the company is responsible hereunder, as soon as practicable after the occurrence of such act shall have come to the knowledge of the employer." The company insists that the receiver in January, February, March and April, 1892, had such information in respect of the acts of O'Brien as cashier, as made it his duty, long before

his letter of May 23, 1892, to give the required notice to the company. Upon this part of the case Judge Wallace, referring to the clause of the policy requiring notice of acts that might involve loss to the defendant, said to the jury: "Under that condition of the policy the defendant was entitled to notice in writing of any act of the cashier which came to the knowledge of the plaintiff of a fraudulent or a dishonest character as soon as practicable after the plaintiff acquired knowledge. It is not sufficient to defeat the plaintiff's right of action upon the policy that it be shown that the plaintiff may have had suspicions of dishonest conduct of the cashier.; but it was plaintiff's duty under the policy, when it came to his knowledge, when he was satisfied that the cashier had committed acts of dishonesty or fraud likely to involve loss to the defendant under the bond, as soon as was practicable thereafter to give written notice to the defendant. Now, the written notice, the first written notice, was given on the 23d day of May, 1892. And in considering this issue you are to inquire first, when it was that the plaintiff became satisfied that the cashier had committed dishonest or fraudulent acts which might render the defendant liable under this policy. He may have had suspicions of irregularities; he may have had suspicions of fraud, but he was not bound to act until he had acquired knowledge of some specific fraudulent or dishonest act which might involve the defendant in liability for the misconduct. Now, when was it he acquired such knowledge? A good deal of testimony has been introduced here upon that issue. After acquiring it, it was his duty, not as soon as possible, to transmit information of it to the defendant, but to do it with reasonable promptness. He was not bound the first day or the next, necessarily, to give notice, but he was to give notice within a reasonable time; and it is for you to say, upon a consideration of all the circumstances of the case, whether he did within a reasonable time after acquiring such knowledge, send the letter of May 23d. It might be reasonable under one state of facts; it might be unreasonable under another. What might be very great diligence under one set of circumstances might be very dilatory

under another.  Now, first, you are to determine when he really acquired the knowledge.  I am not going to recapitulate the testimony.  It is claimed upon his part that he did not acquire the knowledge until the close of the examination by the expert, and that was only within a day or two of the time of mailing the notice ; and so testimony has been given to show that such examination commenced on the first of April and was continued until the latter part of May.  On the other hand it is claimed that he must have acquired knowledge much earlier than this.  Now, there is a circumstance of some significance.  It is hardly to be supposed that this receiver, holding an official trust, would retain in his employ a cashier after he had become satisfied that by the dishonesty or the fraud of that cashier the bank had sustained serious loss.  He did retain him until the 2d day of March. And it may be that while he and those associated with him were entirely satisfied that there had been irregularities, and even perhaps that there had been frauds on the part of the president, they were not aware of any specific acts which could be designated as fraudulent or dishonest on the part of the cashier until the investigation had progressed for a considerable length of time.  On the other hand, you have heard the plaintiff's testimony as given in depositions taken in the west. Various extracts have been read, and it is insisted upon the part of the defendant that he must have known of these acts as early as the early part of February, 1892.  Now, I charge you, as a matter of law, that if the facts were, as they were assumed to be, at the outset of the trial, that is, that the discovery was made early in February and notice was not given until July, that was not notice with reasonable promptness.  And I do not know but that I should charge you, as a matter of law, that if the fact were discovered in the early part of February, and notice was not given until the latter part of May, that was not notice given with reasonable promptness.  But if you come to the conclusion that the discovery was not made until the middle or latter part of May, then, in view of the situation of the plaintiff you may reasonably come to the conclusion that he exercised proper diligence in sending the notice."

We perceive no error in these instructions. They are entirely consistent with the terms of the contract. Much stress was laid, in argument, upon the words " which may involve loss " in the above extract from the bond. But when those words are taken with the words in the same sentence, " as soon as practicable after such act shall have come to the knowledge of the employer," it may well be held that the Surety Company did not intend to require written notice of any act upon the part of the cashier that might involve loss, unless the bank had knowledge, not simply suspicion, of the existence of such facts as would justify a careful and prudent man in charging another with fraud or dishonesty. If the company intended that the bank should inform it of mere rumors or suspicions affecting the integrity of O'Brien, such intention ought to have been clearly expressed in the bond. It was left to the jury to determine when the receiver first acquired knowledge of acts indicating fraud or dishonesty on O'Brien's part, and they found, in effect, that he had no knowledge of any such act until after the report by the expert bookkeepers made about or a few days before May 23, 1892. The trial court went far enough when it said in response to an inquiry by a juror, that notice given May 23, 1892, of a fraud by the cashier discovered as early as March 2d — the day on which O'Brien left the receiver — was not as soon as practicable after the receiver acquired knowledge of the facts.

We have seen that by the terms of the bond in suit the company agreed to make good and reimburse a loss to the bank caused by any act of fraud or dishonesty on the part of O'Brien in connection not only with his duties as cashier, but in connection with " the duties to which in the employer's service he may be subsequently appointed, and occurring during the continuance of this bond, and discovered during such continuance or within six months thereafter *and* within six months from the death or dismissal or retirement of the employé from the service of the employer."

The frauds to which the verdict of the jury referred occurred in October, 1891, during the continuance of the bond.

The bank suspended November 12, 1891. The company insists that, within the meaning of the bond, O'Brien's "retirement" occurred when the bank ceased to do business and closed its doors and the bank examiner entered upon an investigation of its affairs; consequently, it was argued, the discovery of the fraud was not within six months from the "retirement of the employé from the service of the employer."

Undoubtedly the company did not agree to be liable for any fraudulent or dishonest act of the cashier not discovered until after six months from his retirement from the service of the bank. But is it true that, within the meaning of the bond, O'Brien retired from the service of the bank when it suspended business on November 12, 1891? We think not. The bank was in existence under its articles of association while the examiner, under the order of the Comptroller of the Currency, was engaged in the investigation of its affairs. Such investigation did not of itself have the effect to discharge O'Brien from its service. It is true that when the bank suspended business, and the investigation by the examiner commenced, O'Brien ceased to perform the ordinary duties of a cashier. But within the meaning of the bond, O'Brien did not retire from, but remained in, the service of the employer during at least the investigation of the bank's affairs and the custody of its assets by the national bank examiner, which lasted until the appointment of a receiver and his qualification on the 29th day of December, 1891. Certainly, the six months from "the death or dismissal or retirement of the employé from the service of the employer," within which his fraud or dishonesty must have been discovered in order to hold the company liable, did not commence to run prior to the date last named. The bond prescribed at least three limitations of time: First, the company was entitled to written notice of any act of fraud or dishonesty on the part of the employé which might involve loss to it, as soon as practicable after the occurrence of such act should come to the knowledge of the employer; second, it was to be liable only for an act of fraud or dishonesty oc-

curring and discovered during the continuance of the bond and within six months thereafter; third, it was not liable, in any event, for any act of fraud or dishonesty, even if committed during the continuance of the bond, unless it was discovered within six months from the death, dismissal or retirement of the employé from the service of the employer. Of course, O'Brien's death would have terminated his employment as cashier. But he was never dismissed, for his dismissal could only have occurred by the act of the bank or of some one who represented it before or after it suspended business. His "retirement," which would arise from his voluntary act, occurred either when he took service under the receiver, or when he voluntarily left that service on the 2d day of March, 1892. Whether within the meaning of the bond O'Brien was in "the service of the employer" while he was in the service of the receiver, we need not say. It is sufficient for this case to hold that he was in the service of the employer at least up to the time of the receiver's appointment and qualification, which occurred within six months prior to the discovery of his fraud and dishonesty and the giving of notice thereof. We, therefore, hold that the acts of fraud or dishonesty here involved were discovered during the continuance of the bond and within six months after the retirement of the employé from the service of the employer.

In its charge to the jury the trial court called attention to another defence made by the company, namely, that the bond was void by reason of fraudulent misrepresentations and concealments of Collins acting as the president of the bank. The court said: "It is said that this bond of indemnity was obtained upon an application which was certified to by the bank itself, and that in the application facts were misrepresented and facts were concealed with fraudulent intent on the part of the bank; therefore that the bond is void. The application was accompanied by a certificate of Collins, the president of the bank. The only knowledge of any facts which ought to have been communicated, or were misrepresented, the only knowledge which the bank possessed at the time that application was made, was the knowledge of Collins.

himself. Ordinarily a corporation, like any other principal, is chargeable with the knowledge of any facts which are known to its agents; but in this case all these transactions, if there were any transactions of a fraudulent and dishonest character on the part of the cashier, were transactions for the benefit of Collins, and he was a participator in the fraud, and under those circumstances the law does not infer that the agent or the officer will communicate the fact to his principal, the corporation, and under such circumstances the corporation is not bound by his knowledge. So this defence melts away and there is nothing of it whatever."

The company insists that in obtaining the bond in suit Collins acted for the bank, and as a corporation can only speak by agents, the bank is responsible for any false or fraudulent statements in the certificate given by Collins to the Surety Company, and which he signed as president of the bank.

In support of its contention the company cites *Franklin Bank* v. *Cooper*, 36 Maine, 179, 197; *Graves* v. *Lebanon Nat. Bank*, 10 Bush, 23, 29; *Veazie* v. *Williams*, 8 How. 134, 156; *Bennett* v. *Judson*, 21 N. Y. 239; *Nat. Life Ins. Co.* v. *Minch*, 53 N. Y. 144, 149; *Holden* v. *New York & Erie Bank*, 72 N. Y. 286, 292; *Elwell* v. *Chamberlin*, 31 N. Y. 611, 619. What were those cases?

*Franklin Bank* v. *Cooper* was the case of a suit against the executor of one of the sureties in a cashier's bond. Prior to the acceptance of the bond by the directors of the bank a deficiency or defalcation existed in the cashier's accounts, of which the president and some of the directors had knowledge when the bond was taken, but which fact was not communicated to the surety. After observing that knowledge by the surety of the existing deficiency in the cashier's accounts might have had an important influence on his conduct, the court said: "One who becomes surety for another must ordinarily be presumed to do so upon the belief that the transaction between the principal parties is one occurring in the usual course of business of that description, subjecting him only to the ordinary risks attending it; and the party to whom he

becomes a surety must be presumed to know that such will be his understanding and that he will act upon it, unless he is informed that there are some extraordinary circumstances affecting the risk. To receive a surety known to be acting upon the belief that there are no unusual circumstances by which his risk will be materially increased, well knowing that there are such circumstances and having a suitable opportunity to make them known and withholding them, must be regarded as a legal fraud, by which the surety will be relieved from his contract."

*Graves* v. *Lebanon Nat. Bank* was a suit upon the bond of a cashier of the bank. The court stated the case to be one in which the directors of a bank "held out" to others as a trustworthy officer a man who had been guilty of repeated embezzlements and frauds, all of which might have been discovered by the exercise of slight diligence by the directors. The grounds upon which the surety was held discharged were thus stated by the court: "There is no principle of law better settled than that persons proposing to become sureties to a corporation for the good conduct and fidelity of an officer to whose custody its moneys, notes, bills and other valuables are entrusted have the right to be treated with perfect good faith. If the directors are aware of secret facts materially affecting and increasing the obligation of the sureties, the latter are entitled to have these facts disclosed to them, a proper opportunity being presented."

*Veazie* v. *Williams* was the case of a purchaser at an auction sale, seeking to be relieved from his purchase because of fraud practised at the sale by the auctioneer, who was the general agent of the owners, and the benefits of which sale the owners received. After a reference to many authorities, the court placed the liability of the owners upon these grounds: "Whe the vendor may not do in person or may not employ others to do in his absence — that is, make by-bids to enhance the price — his agent, the auctioneer, cannot rightfully do. But they are held liable on a ground beyond and apart from all this, and as well settled in England as here, that if a principal ratify a sale by his agent, and take the benefit of it, and it

afterwards turn out that fraud or mistake existed in the sale, the latter may be annulled and the parties placed *in statu quo*; or they may, where the case and the wrong are divisible, be at times relieved to the extent of the injury. . . . But the test here is, Was the purchaser deceived, and has the vendor adopted the sale, made by deception, and received the benefits of it? For, if so, he takes the sale with all its burdens. *Wilson* v. *Fuller*, 3 Ad. & Ell. (N. S.) 68. The sale, thus made here, was adopted and carried into effect by the respondents; and hence, on account of the fraud involved in it, they should either restore the consideration and take back the mills, or indemnify the purchaser to the extent of his suffering."

In *Bennett* v. *Judson*— which was the case of an agent of the vendor of land who made material misrepresentations as to its location and qualities, assuming to have knowledge of the facts, but without express authority from his principal — the court said: " There is no evidence that the defendant authorized or knew of the alleged fraud committed by his agent Davis in negotiating the exchange of lands. Nevertheless, he cannot enjoy the fruits of the bargain, without adopting all the instrumentalities employed by the agent in bringing it to a consummation. If an agent defraud the person with whom he is dealing, the principal, not having authorized or participated in the wrong, may, no doubt, rescind, when he discovers the fraud, on the terms of making complete restitution. But so long as he retains the benefits of the dealing, he cannot claim immunity, on the ground that the fraud was committed by his agent and not by himself. This is elementary doctrine, and it disposes of one of the questions raised at the trial."

In *National Life Ins. Co.* v. *Minch*— which was an action to recover back money paid on a policy fraudulently obtained by a husband on the life of his wife, the fraud not having been discovered until after the money was paid — the court said: " Again, if the husband, as the agent of the wife, procured the policy by fraud, she cannot retain the benefit of it and be relieved from the consequences of the fraudulent means by

which it was obtained. It is established that an innocent principal cannot take an advantage resulting from the fraud of an agent without rendering himself civilly liable to the injured party. 10 N. Y. 34; *Graves* v. *Spier*, 58 Barb. 349. If the husband obtained the policy by a fraud, acting as the agent of his wife, he occupies the position of claiming to keep money, as her legal representative, which he fraudulently obtained as her agent. He is defending this action upon her title to the policy, which, if procured by his fraud, is invalid."

*Holden* v. *New York & Erie Bank* was an action grounded on the fraud of a cashier in certain matters with which he was connected not only as cashier but individually and as executor of an estate. The court said: "As matter of fact, whatever knowledge, information or notice he had in either of these capacities, he carried with him into his exercise of the other. As agent of the bank, he owed it a duty in every transaction in which the bank took a part, under his observation. Hence, as matter of law, whatever notice of facts he had in any capacity, which were material in the performance by him of the part of the bank in any transaction, became notice to the bank, his principal; as it was his duty to give it notice thereof in that matter. It is the rule that the knowledge of the agent is the knowledge of his principal, and notice to the agent of the existence of material facts is notice thereof to the principal, who is taken to know everything about a transaction which his agent in it knows. This rule is sometimes stated so as to limit it to notice arising from, or at the time connected with, the subject-matter of his agency. Such notice must have come to the agent, it is said, while he is concerned for the principal, and in the course of the very transaction, or so near before it that the agent must be presumed to recollect it. This limitation, however, applies more particularly to the case of an agent whose employment is shortlived, so that the principal shall not be affected by knowledge that came to the agent before his employment began, nor after it was terminated. But where the agency is continuous, and concerned with a business made up of a long series

of transactions of a like nature, of the same general character, it will be held that knowledge acquired as agent in that business in any one or more of the transactions, making up from time to time the whole business of the principal, is notice to the agent and to the principal, which will affect the latter in any other of those transactions in which that agent is engaged, in which that knowledge is material. . . . That Ganson held triple relations to the matter did not alter his relation. to the bank, his principal, nor did it hinder his knowledge acquired as an agent from affecting his principal in the part he took as an agent. The subject-matter of his agency was the conduct and direction of the affairs of this bank. He represented the bank in all these transactions. He was every time of them engaged in the business of the bank. Notice to him while so engaged, though no otherwise received than by the possession of knowledge acquired by him while acting in another capacity, was notice to the bank. That is a necessary result of his triple character."

*Elwell* v. *Chamberlin* related to the exchange of a note, in respect of which fraud was charged. The court said : "It is not material that the plaintiffs authorized or knew of the alleged fraud committed by their agent Mills in negotiating the sale of the note. They cannot be permitted to enjoy the fruits of the bargain without adopting all the instrumentalities employed by the agent in bringing it to a consummation. They have ratified the sale by seeking to enforce payment of the check given for the thing sold. If an agent defrauds the person with whom he is dealing, the principal, not having authorized or participated in the wrong, may, no doubt, rescind, when he discovers the fraud, on the terms of making complete restitution. But so long as he retains the benefits of the dealing, he cannot claim immunity, on the ground that the fraud was committed by his agent and not by himself."

These cases, so far as they relate to sureties, rest upon the principle that, "if a *party* taking a guaranty from a surety conceal from him facts which go to increase his risk and suffers him to enter into the contract under false impressions as to the real state of facts, such concealment will amount to

a fraud, because the party is bound to make the disclosures, and the omission to make them under such circumstances is equivalent to an affirmation that the facts do not exist." 1 Story's Equity Jurisprudence, § 215. And the cases of *Veazie* v. *Williams, Bennett* v. *Judson, National Life Ins. Co.* v. *Minch, Holden* v. *New York & Erie Bank,* and *Elwell* v. *Chamberlin,* rest upon the presumption, which the law indulges, that an agent will inform his principal of what it is his duty to communicate to the latter. *The Distilled Spirits,* 11 Wall. 356, 367; *Davis Imp. Wrought Iron Wagon Wheel Co.* v. *Davis Wrought Iron Wagon Co.,* 20 Fed. Rep. 699, 701. This rule is fully stated in Story on Agency, § 140, in which the author says that "notice of facts to an agent is constructive notice thereof to the principal himself, where it arises from or is at the time connected with the subject-matter of his agency; for, upon general principles of public policy, it is presumed that the agent has communicated such facts to the principal; and if he has not, still the principal having entrusted the agent with the particular business, the other party has a right to deem his acts and knowledge obligatory upon the principal; otherwise, the neglect of the agent, whether designed or undesigned, might operate most injuriously to the rights and interests of such party."

Without stopping to consider whether each of the above cases was correctly decided, it may be observed that those relating to sureties in bonds given to corporations arose directly between the sureties and corporations represented *by their boards of directors or by some of their officers acting within the authority conferred upon them;* and that those relating to the liability of a principal by reason of the acts or representations of his agent, arose out of the agent's acts or declarations *in the course of the business entrusted to him.*

None of the cases cited embrace the present one. In the first place, the procuring of a bond for O'Brien, in order that he might become qualified to act as cashier, was no part of the business of the bank nor within the scope of any duty imposed upon Collins as president of the bank. It was the

business of O'Brien to obtain and present an acceptable bond. And it was for the bank, by its constituted authorities, to accept or reject the bond so presented. The bank did not authorize Collins to give, nor was it aware that he gave, nor was he entitled by virtue of his office as president to sign, any certificate as to the efficiency, fidelity or integrity of O'Brien. No relations existed between the bank and the Surety Company until O'Brien presented to the former the bond in suit. What therefore Collins assumed in his capacity as president to certify as to O'Brien's fidelity or integrity, was not in the course of the business of the bank nor within any authority he possessed. He could not create such authority by simply assuming to have it. The Circuit Court of Appeals, speaking by Judge Lacombe, well said that there were many acts which the president of a bank may do without express authority of the board of directors, in some cases because the usage of the particular bank impliedly authorized them, in other cases because such acts were fairly within the ordinary routine of his business as president; but that the making of a statement, as to the honesty and fidelity of an employé for the benefit of the employé, and to enable the latter to obtain a bond insuring his fidelity, was no part of the ordinary routine business of a bank president, and there was nothing to show that by any usage of this particular bank such function was committed to its president.

It must therefore be taken, as between the bank and the company, that the former cannot be deemed, merely by reason of Collins' relation to it, to have had constructive notice that he as president gave the certificate in question.

The presumption that the agent informed his principal of that which his duty and the interests of his principal required him to communicate does not arise where the agent acts or makes declarations not in execution of any duty that he owes to the principal, nor within any authority possessed by him, but to subserve simply his own personal ends or to commit some fraud against the principal. In such cases the principal is not bound by the acts or declarations of the agent unless it be proved that he had at the time actual notice of them, or

having received notice of them, failed to disavow what was assumed to be said and done in his behalf.

In *Henry* v. *Allen*, 151 N. Y. 1, 10, the court recognized the general rule. But after observing that it rested upon the agent's duty to disclose such facts to his principal, it held that one of the exceptions was that where the agent was "engaged in a scheme to defraud his principal, the presumption does not prevail, because he cannot in reason be presumed to have disclosed that which it was his duty to keep secret, or that which would expose and defeat his fraudulent purpose."

To the same effect are *Benedict.* v. *Arnoux*, 154 N. Y. 715, and *Kettlewell* v. *Watson*, 21 Ch. Div. 685, 707. In the latter case it was said that the presumption arising from the duty of the agent to communicate what he knows to his principal "may be repelled by showing that, whilst he was acting as agent, he was also acting in another character, viz., as a party to a scheme or design of fraud, and that the knowledge which he attained was attained by him in the latter character, and that therefore there is no ground on which you can presume that the duty of an agent was performed by the person who filled that double character."

In *Commercial Bank* v. *Cunningham*, 24 Pick. 270, 276, which involved the question whether certain notes held by a bank were to be deemed to have been made for the accommodation of a firm, one member of which was a director of the bank at the time the notes were taken, it was held that the knowledge of the latter, although a director, was no proof of notice to the corporation, "especially as he was a party to all these contracts, whose interests might be opposed to that of the corporation." This principle is reaffirmed in *Innerarity* v. *Merchants' National Bank*, 139 Mass. 332, 333, in which the court said: "While the knowledge of an agent is ordinarily to be imputed to the principal, it would appear now to be well established that there is an exception to the construction or imputation of notice from the agent to the principal in case of such conduct by the agent as raises a clear presumption that he would not communicate the fact in controversy, as where the communication of such a fact would necessarily

prevent the consummation of a fraudulent scheme which the agent was engaged in perpetrating " — citing *Kennedy* v. *Green*, 3 Myl. & K. 699 ; *Cave* v. *Cave*, 15 Ch. D. 639 ; *In re European Bank*, L. R. 5 Ch. App. 358 ;. *In re Marseilles Extension Railway*, L. R. 7 Ch. App. 161 ; *Atlantic National Bank* v. *Harris*, 118 Mass. 147 ; *Loring* v. *Brodie*, 134 Mass. 453.

In *Terrell* v. *Branch Bank of Mobile*, 12 Alabama, 502, 507, the question was as to the liability of the maker of a note executed in blank and delivered by him to a director of a bank to be filled up with a certain sum, and to be used in the renewal of a note of the maker already held by the bank. The director (Scott) filled up the note for a larger amount and had it discounted for his own use, he acting as one of the directors when the discount occurred, but concealing the facts from the other directors. It was contended that the knowledge of Scott as director of the circumstances under which the note was made and offered for discount, his connection with the directory, and his presence when it was discounted by the bank, were in law a notice to the other directors of the facts. The Supreme Court of Alabama said : " It cannot be admitted that in receiving the blank of the defendant to be used for his benefit, Scott acted as the agent of the bank ; and certainly he did not thus act in abusing the authority conferred on him by the defendant. But in filling up the blank for a larger amount than his authority required, and then offering the note for discount, he was in reality the representative of his own interest. *Pro re nata*, his powers as a director were suspended — he was contracting with the bank through his associates in the directory — he was borrow-. ing, not lending its money — though a member of the board and present too, it cannot be supposed that he coöperated with them in purchasing paper of which he was the avowed proprietor ; and whether he did or not, it cannot be presumed that he made any disclosure which would prejudice his application for a loan."

In his treatise on Equity Jurisprudence, Pomeroy says : " It is now settled by a series of decisions possessing the highest

authority that when an agent or attorney has, in the course of his employment, been guilty of an actual fraud contrived and carried out for his own benefit, by which he intended to defraud and did defraud his own principal or client, as well as perhaps the other party, and the very perpetration of such fraud involved the necessity of his concealing the facts from his own client, then under such circumstances the principal is not charged with constructive notice of facts known by the attorney and thus fraudulently concealed." Vol. 2, § 675.

Further citation of authorities would seem to be unnecessary to support the proposition that if Collins gave the certificate that he might, with the aid of O'Brien as cashier, carry out his purpose to defraud the bank for his personal benefit, the law will not presume that he communicated to the bank what he had done in order to promote the scheme devised by him in hostility to its interests. In our judgment the Circuit Court of Appeals correctly held that plaintiff's right of action on the bond was not lost because its president, Collins, made to the defendants false representations as to the cashier's honesty; and that when two officers of a corporation have entered into a scheme to purloin its money for the benefit of one of them, " in pursuance of which scheme it becomes necessary to make false representations to a third person ostensibly for the bank, but in reality to consummate such scheme and for the benefit of the conspirators, and not in the line of ordinary routine business of such officers and without express authority, the corporation being ignorant of the fraud, the officers are not in thus consummating such theft the agents of the corporation."

It is contended that admitting in evidence Collins' ledger account and the letter book was error to the prejudice of the substantial rights of the defendant. We cannot assent to this view, and as the matter was satisfactorily disposed of by the Circuit Court of Appeals, it is sufficient to refer to the opinion of that court for our views on this point.

It is said the claim or proof of loss mailed to the company on June 24, 1892, and the receipt of which was acknowledged July 8, 1892, was not served as soon as practicable

after the discovery of a loss for which the company was liable, nor within six months after the expiration or cancellation of the bond. We cannot assent to these propositions. It must be assumed from the verdict that, within the meaning of the bond, the loss was discovered the latter part of May, and that written notice of it was given as soon thereafter as was practicable. As, for the reasons heretofore stated, O'Brien did not retire from the service of the bank prior at least to December 29, 1891, it is clear that the objection under consideration is not well taken. Under the facts found, it must be held that proper notice of the loss was given as soon as practicable after the discovery of the fraud of O'Brien and within six months after his retirement from the service of his employer, and that the claim was made in such form as to reasonably inform the company of its nature. When received, no objection was made that notice of it was not served in time, nor that it was not sufficiently full to indicate the grounds upon which the receiver would proceed against the company upon its bond.

Having considered all the questions which, in our judgment, need to be examined, and perceiving no error of law in the record to the prejudice of the substantial rights of the Surety Company, the judgments of the Circuit Court and the Circuit Court of Appeals are

*Affirmed.*