## MUTUAL LIFE INS. CO. OF NEW YORK v. SEYMOUR et al. (two cases).

### Nos. 208, 209.

District Court, S. D. Illinois, N. D.

Jan. 4, 1928.

Winston, Strawn & Shaw, of Chicago, Ill., and Miller, Elliott & Westervelt, of Peoria, Ill., for plaintiff.

Dailey, Miller, McCormick & Radley, of Peoria, Ill., for defendant.

FITZHENRY, District Judge.

Plaintiff has presented its bills in cases Nos. 208 and 209, praying for the cancellation and rescission of two life insurance policies issued by it upon the life of Arthur Seymour. In case No. 208, it prays the cancellation and rescission of policy No. 2866049, in which Helen H. Seymour, the wife of the assured, is made the beneficiary; in case No. 209, policy No. 2862160, in which Arthur J. Seymour, a son of the assured, is the beneficiary. In each case, besides the named beneficiary, Helen H. Seymour, executrix of the estate of Arthur Seymour, deceased, is joined as a party defendant. The defendants, answering, denied the material allegations in plaintiff's bills, recited the death of the insured, the filing of proofs of loss under the respective policies, and asked for judgment for the amount of the policies.

At the time these two policies were written, and application for them made, it must have been known to the applicant that he was afflicted with a serious disease, angina pectoris, progressive in its nature, to the extent of fatality. His regular physician had advised him to that effect, directed him to avoid overeating or overexertion, and two eminent specialists had advised him substantially to the same effect. His regular physician, who was also the medical examiner for a life insurance company, other than plaintiff, was told by one of his company's solicitors that he was going to get an application for insurance from Arthur Seymour. The doctor told the agent not to bring in any application for insurance from him, because he (Seymour) could not get a nickel's worth of insurance in that company. Thereupon, the solicitor took the matter up with the agent of another company (plaintiff). The application was procured, and arrangements made by the agent for medical examination by the regular examiner of the plaintiff company, Dr. P. M. Burke, at his office in La Salle, Ill., on that evening, March 15, 1921. The examination was made. It resulted favorably to applicant, and the policy for $5,000 was issued in favor of applicant's son, Arthur J. Seymour. When that policy was delivered, application was made for another policy for $10,000, payable to the wife of the applicant, and was to be issued upon the original application.

It is contended by plaintiff that the applicant made false answers, known to be false by him, to the medical examiner, Dr. P. M. Burke, an aged practitioner of ability, integrity, and experience. Upon the representations of the applicant and such examination as Dr. Burke could make, he found the applicant to be in a condition of good health, with no impairment. The applicant certified he had read over the answers to the questions as written in by the doctor, and said they were true and correctly written down. The answers as written down were untrue.

However, the defendants seek to avoid the consequences of the discrepancies between the answers and the truth by showing by the son of the insured, Arthur J. Seymour, that he went with his father to the doctor's office and was personally present with him the next day after the application was originally taken and saw the examination of his father made by Dr. Burke, heard the conversations between his father and the doctor, in which the son claimed his father told Dr. Burke that the Mayos, Dr. J. B. Herrick of Chicago, and Dr. Fullenwider of La Salle, had all said that he had heart trouble, etc., but that Dr. Burke said that was "all bunk" and they need not put that in the application because he (Seymour) was a well man.

The substantial defense interposed by the defendants was that the applicant made truthful answers to the medical examiner and the examiner did not correctly record them; that the knowledge of the examiner is the knowledge of the company and the company

is estopped from setting up in defense the statements recorded by the medical examiner, relying upon Union Mut. L. Insurance Co. v. Wilkinson, 13 Wall. 222, 20 L. Ed. 617; American Life Insurance Co. v. Mahone, 21 Wall. 152, 22 L. Ed. 593; New Jersey Mutual Life Ins. Co. v. Baker, 94 U. S. 610, 24 L. Ed. 268; and Continental L. Ins. Co. v. Chamberlain, 132 U. S. 305, 10 S. Ct. 87, 33 L. Ed. 341.

The character of discrepancies referred to by the line of authorities just above quoted may be illustrated by what the Circuit Court of Appeals of the Fifth Circuit said with reference to the Chamberlain Case, supra, in Mutual Life Ins. Co. of N. Y. v. Powell, 217 F. 565, 568:

"In the Chamberlain Case the false representation was as to other insurance. The insured was a member of certain co-operative societies, and informed the agent of that fact, and after considerable discussion it was decided to answer the question as to other insurance in the negative. There was no question as to the good faith of either the insured or the agent, and there was some latitude for difference of opinion."

In his testimony as to what happened upon the examination of the insured in these cases, Seymour, the son, went into minute details. He testified that the examination was made the next day after the application was signed by his father for the agent, which was on March 15th. He said he went with his father to Dr. Burke's office; that Dr. Burke stripped his father to the waist, examined him with a stethoscope, thumped him on the back and chest, put instruments in his ears, examined his chest and heart; that his father asked Dr. Burke how his heart beat was, and the doctor said it was all right; Dr. Burke took his height and weight and urine, which the doctor examined; that Dr. Burke told him he found he was in perfectly good health, and then his father took up the subject of his heart. The doctor asked him if he had ever been in a sanitarium or hospital, which was on the form, and his father told him, yes, he had been to Mayo Brothers. He said he wanted to know what his trouble was, if he had any; "they set him in a chair and it seems there was something electrical about the examination, that it was done by electricity in some way, and he told him what their result was, that they told him he had this heart disease called angina. And the doctor immediately got his apparatus out and again went over his heart and examined his chest throughout. And of course,

he asked several questions, there was a good many different questions asked." That Dr. Burke said "he could not find anything wrong with him in any respect and that he just felt it was 'all bunk' and that there was nothing wrong with his heart at all."

The witness McGinnis, the soliciting agent who procured the original application, testified that the day the application was taken he arranged for the medical examination, met the insured in front of Dr. Burke's office that evening, and accompanied him into Dr. Burke's office; that Dr. Burke retired to his private room with the insured; after they had remained there quite a while, they came out; Seymour, the insured, was alone; the son did not accompany him to the office, nor had he been in the private office during the examination by Dr. Burke. Just after they came out of the private office, insured left Dr. Burke's office. McGinnis, the agent, waited for Dr. Burke to complete the physician's part of the examination and upon its completion, the application was given to McGinnis, who left Dr. Burke's office and immediately turned the application over to Mr. Riorden, the agent for plaintiff.

In addition to the agent's testimony as to the absence of the insured's son during the examination, Dr. Burke answered question 34 of the original examiner's report, which was, "Was any third person present, contrary to the Company's rule, while you were asking the applicant questions?" "No," the answer being in Dr. Burke's handwriting.

There is no evidence of any other application concerning the insured which was made and executed on the 16th day of March, or at any other time than the one described by the agent, a photostatic copy of which was attached to the policy.

If Arthur J. Seymour's testimony is untrue, and the answers made by the insured to the examiner were correctly recorded by the examiner, as the insured says in writing they were, then they were clearly false, because the record shows beyond any possibility of question that the insured knew and had known since 1919 that he was afflicted with a fatal malady and had been sent to specialists with reference to his condition and his activities incident to it.

On the other hand, if the testimony of the son Arthur J. Seymour is true, it would simply establish that Dr. Burke was a party to the fraud, and knowing all of the facts, wrote answers which were untrue into the application, and after so doing, the insured

himself certified that the doctor had correctly recorded his answers to the questions.

The United States Supreme Court, in discussing a case very decidedly analogous to the present one, Mutual Life Ins. Co. of New York v. Hilton-Green, Ex'r of Wiggins, 241 U. S. 613, 36 S. Ct. 676, 680, 60 L. Ed. 1202, said:

"The general rule which imputes an agent's knowledge to the principal is well established. The underlying reason for it is that an innocent third party may properly presume the agent will perform his duty and report all facts which affect the principal's interest. But this general rule does not apply when the third party knows there is no foundation for the ordinary presumption, —when he is acquainted with circumstances plainly indicating that the agent will not advise his principal. The rule is intended to protect those who exercise good faith, and not as a shield for unfair dealing. Distilled Spirits, 11 Wall. 356, 367, 20 L. Ed. 167, 171; American Surety Co. v. Pauly, 170 U. S. 133, 156, 18 S. Ct. 552, 42 L. Ed. 977, 985; American Nat. Bank v. Miller, 229 U. S. 517, 521, 522, 33 S. Ct. 883, 57 L. Ed. 1310, 1312, 1313; Mechem, Agency, 2d Ed. § 1815. * * *

"The assured at the least consciously permitted an application containing material misrepresentations to be presented by subordinate agents to officers of the insurance company under circumstances which he knew negatived any probability that the actual facts would be revealed; and later he accepted policies which he must have understood were issued in reliance upon statements both false and material. He could claim nothing because of such information in the keeping of unfaithful subordinates. Moreover the false representations accompanied and were essential parts of the policies finally accepted. He did not repudiate, and therefore adopted and approved, the representations upon which they were based. Beyond doubt an applicant for insurance should exercise toward the company the same good faith which may be rightly demanded of it. The relationship demands fair dealing by both parties. New York Life Ins. Co. v. Fletcher, 117 U. S. 519, 529, 533, 534, 6 S. Ct. 837, 29 L. Ed. 934, 939, 940; Assurance Co. v. Building Association, 183 U. S. 308, 361, 22 S. Ct. 133, 46 L. Ed. 213, 234; U. S. Life Ins. Co. v. Smith, 34 C. C. A. 506, 92 F. 503."

Mutual Life Ins. Co. of N. Y. v. Powell (C. C. A. 5th) 217 F. 565, 567, was a case very much like the one at bar. The plaintiff there, as one of the plaintiffs here, went upon the witness stand to show that he was present when his wife was examined by the doctor for the insurance policy there involved. He testified:

"Q. Mr. Powell, when those questions were asked about the treatment, what treatment she had had, surgical operations and things of that kind, what answer did she make Dr. Groves? A. She says to Dr. Groves, 'You know my condition;' she says, 'You know I have been treated by you and Dr. Culbertson and Dr. Oertel; what should my answer be in a case like that?' The doctor says, 'You are done and well now; you have been well for four years; you haven't felt any effects of this place,' he says; 'I would answer in the negative; I would answer, "No"—that I was not in the hospital, and was not treated, according to the questions asked in the application.'

"Q. Who wrote those answers? A. Dr. Groves."

The same line of authorities were there relied upon as is invoked by the defendants here. The Court of Appeals said:

"The conduct of the insured in this case is incompatible with good faith. It may be that neither she nor her husband knew that she was afflicted with cancer, as all people are prone to deceive themselves with regard to lingering and fatal maladies; but even as to this there is considerable doubt. But it is unbelievable that she did not know that the trouble with her breast was serious, as otherwise her family physician would not have sent her to specialists. * * * As to her knowledge of these facts the testimony of her husband removes all doubt."

In this case it might also be well said as to Arthur Seymour's knowledge of the facts, the testimony of his son Arthur J. Seymour removes all doubt, if true. The Court of Appeals, in the Powell Case, supra, used this language, which is pertinent:

"In this case it is apparent that a gross fraud was perpetrated on the insurer, which would have been impossible without the active participation of the insured. The medical examiner was not the agent of the company for the purpose of defrauding it. It had the right to rely on the statements of the insured that her answers were true and had been correctly recorded by the doctor, and it is not estopped to set up their falsity."

█ Defendants also contend that the truth about Seymour's condition was disclosed to Dr. Burke and that, knowing the facts, he

wrote the answers into the application which plaintiff claims were untrue, and therefore, the doctor being the agent of the company, the company is estopped by the knowledge of the agent to complain of the false answers to the material questions here involved. These policies contain the following provisions:

"Notice: No agent or other person except the President, Vice-President, a second Vice-President, a Secretary or the Treasurer of the Company has power on behalf of the Company to make, modify or discharge this or any contract of insurance, to extend the time for paying a premium, to waive any lapse or forfeiture or any of the Company's rights or requirements, or to bind the Company by making any promise respecting any benefits hereunder, or by accepting any representation or information not contained in the written application for this policy."

In Prudential Ins. Co. v. Moore, 231 U. S. 560, 34 S. Ct. 191, 194, 58 L. Ed. 367, the Supreme Court said:

"It is contended here, as in the Aetna Case [231 U. S. 543, 34 S. Ct. 186, 58 L. Ed. 356], that the company is estopped by the knowledge of the agent, and the same cases are cited as were cited there. We answer here, as we answered there, that the terms of the policy constituted the contract of the parties and precluded a variation of them by the agent."

In Maryland Casualty Co. v. Eddy (C. C. A. 6th) 239 F. 477, 482, it was said:

"In this disposition of the matter, the conclusion seems necessarily involved, although not spelled out, that to say that the company is estopped to rely upon such a false answer because its agent had knowledge, is to say that the terms of the contract are to be changed. Upon the subject of knowledge by the agent under similar circumstances, see, also, Mutual Co. v. Hilton, supra, 241 U. S. at page 623, 36 S. Ct. 676, 60 L. Ed. 1202, and Mutual Co. v. Powell, supra, 217 F. at page 568, 133 C. C. A. 417."

So, we conclude that the testimony of Arthur J. Seymour, if true, does not tend to avoid the consequences of the false representations made and upon which both policies in these cases were issued. Its only effect is to raise a question as to the integrity of plaintiff's medical examiner, who is now deceased and who up to the time of his death, in the community in which he resided, had been known as an honorable, faithful medical practitioner.

The principle invoked by the defendants, which establishes that where an agent of the company prepares the application or makes representations to the insured as to the character and effect of the statements of the applicant, he will be regarded in so doing as the agent of the company, and not the agent of the insured, and which principle is sustained by the authorities heretofore referred to, can be of no avail to the defendants in this case. The later decisions enforce the provisions of a policy. These contracts contain the provision that:

"No agent or other person, (except the respective officers of the company) has power on behalf of the company to make, modify or discharge this or any contract of insurance, * * * or to bind the Company by making any promise respecting any benefits hereunder, or by accepting any representation or information not contained in the written application for this policy."

Seymour, the insured, expressed his understanding to be that the company or one of its executive officers and no other person could waive any of its rights or grant insurance or make any agreement binding upon the company. The later decisions of the Supreme Court recognize the competency of applicants for insurance to make such agreements and that they are binding when made. Aetna Life Ins. Co. v. Moore, 231 U. S. 543, 34 S. Ct. 186, 191, 58 L. Ed. 356.

The contention of the defendants that what was said by the Supreme Court in Mutual Life Ins. Co. v. Hilton-Green, 241 U. S. 623, 36 S. Ct. 676, 60 L. Ed. 1202, does not apply and cannot be considered in this case for the reason that these bills are suits outside of the contracts, that the company is not claiming under the contract at all. This charge is true with reference to the plaintiff in these cases. It is an attempt to set aside the contracts, on the ground of fraud in procuring their execution so far as the insurer is concerned, but it must not be overlooked that defendants, by their answers, have made it a suit based upon the contracts and are asking affirmative relief and judgment for the amount of the alleged loss sustained by the defendants under the contracts.

Defendants are asking the court to hold that the knowledge of Dr. Burke of the untruthfulness of the representations made by the applicant to be the knowledge of the company and that the plaintiff is thereby estopped to assert the untruthfulness of the applicant's answers to the material questions. They ask for a strict construction and application of the Illinois statute (Smith-

Hurd Rev. St. 1929, c. 73, § 261(3) providing:

"That the policy, together with the application therefor, a copy of which application shall be endorsed upon or attached to the policy and made a part thereof, shall constitute the entire contract between the parties."

So, as far as the defendants are concerned, they have made these suits actions upon the contracts themselves and in the state of the issues, as raised, the law applicable both to setting aside the contracts procured through fraudulent representations, and to actions seeking a recovery upon the contracts alleged to have been executed, as claimed, are applicable in these cases.

Reliance is placed upon Joseph v. New York Life Ins. Co., 308 Ill. 93, 139 N. E. 32. The Joseph Case was an action against the New York Life Insurance Company to recover upon a certain insurance policy. A number of pleas were filed by the defendant, charging that the answers orally made to the examiner were false. The pleas clearly alleged fraud in procuring the policies of such a character as was available to the company as a defense. The plaintiff filed replications to each of the additional pleas. The averment contained in the tenth, eleventh, twelfth, and thirteenth replications, that all of Joseph's answers were full, complete, and true, was a complete answer to the charge in the pleas that they were false and fraudulent. The Illinois Supreme Court said:

"Whether they were in fact true or false might have been determined from the evidence on a trial, if an issue as to the fact had been formed. The defendant, however, filed a general demurrer, which admitted the allegation of the replications that the answers were true. This demurrer was properly overruled, and a judgment for the plaintiff on the pleadings necessarily followed." Page 99 of 308 Ill., 139 N. E. 32, 34.

It was very earnestly contended that the $10,000 policy payable to Helen H. Seymour should not be canceled or rescinded, but that judgment for the face of the policy should be entered in favor of the defendant in case No. 208, for the reason that no copy of an application for the $10,000 policy was ever attached to or indorsed on the policy, that therefore, under the statute of Illinois requiring that the application be attached to the policy at the time of its issue, and under the language of the policy, which is even stronger than the statute, no statement made in such application, whether it be a warranty or whether made in good faith or fraudulently, can be used by the company to defeat the policy. The language of the policy is especially relied upon, where it provides:

"This policy and the application therefor, a copy of which is endorsed hereon or attached hereto, constitute the entire contract between the parties hereto. All statements made by the insured shall, in the absence of fraud, be deemed representations and not warranties, and no such statements of the insured shall avoid or be used in defense to a claim under this policy unless contained in the written application therefor, and a copy of the application is endorsed on or attached to this policy when issued."

The $10,000 policy when produced in court had attached thereto a photostatic copy of the application of March 15th, upon which the $5,000 policy had been issued, containing the questions asked the insured and the answers thereto written out by Dr. Burke and the certificate of the applicant that they had been correctly reported by the examiner and were true, and signed by the applicant. The application for the $10,000 policy was not attached. Upon the trial, however, plaintiff produced the original application, which recited an agreement between the parties that the application for the former policy dated March 15, 1921, should stand as the application for the $10,000 policy, and upon the bottom of it was a receipt, reciting that the assured had received a copy of it attached to policy No. 2866049.

It is charged that this $10,000 policy shows upon its face that it was issued upon an application for a $5,000 policy, with a different beneficiary; that therefore it shows certain representations upon which the other policy was issued, but no representations upon which the $10,000 policy was issued; therefore a recovery must be permitted upon that policy.

Were this an action at law to recover upon the policy, the question might merit consideration. However, so far as the plaintiff is concerned in case No. 208, this is an action to cancel and rescind a contract procured through fraudulent representation and, as the defendants have said, is an action outside the contract. The evidence clearly shows that the plaintiff acting upon the theory that the answers as to the physical condition of the insured were true and not false, agreed that those representations might stand as the basis for an additional policy upon the life of the assured, payable to a different beneficiary, in the sum of $10,000. Exhibit D,

the application for the second policy, clearly establishes this fact, so that if there was fraud practiced in procuring the execution by the plaintiff of the first policy, the same fraud was used and operated to procure the execution of the second policy and made it subject to all of the frailties attending the first policy. There was no representation contained in the application for the second policy beyond the reaffirmance that the physical condition of the assured at the time of the execution of the original application was the same, that is, that there had been no change in his physical condition since the original application was executed. Nor is it contended here by the plaintiff that there was any material change. We therefore conclude that the fraud incident to the execution of the original application was also the basis upon which the second policy was written and likewise vitiated it.

Decrees may be prepared and submitted in harmony with the prayer of the plaintiff's bills.