FIDELITY & DEPOSIT CO. OF MARYLAND v. COURTNEY.

(Circuit Court of Appeals, Sixth Circuit. July 13, 1900.)

No. 751.

**1. INDEMNITY—DISCHARGE OF GUARANTOR—DEFAULT—KNOWLEDGE OF ASSURED —NOTICE.**

In an action upon a bond of indemnity to a bank, against loss by fraudulent acts of its president, and which provided that the employer should immediately give notice, in writing, of the discovery of any default or loss thereunder, it appeared that checks drawn by the president were, at his request, carried by the cashier as cash items for a considerable length of time; that other checks were, by the direction of the president, charged to the accounts of other parties than those drawing them; that the money so obtained was used by the president in buying up members of the city council to advance his interests; and that the cashier was required one evening to remain after banking hours to pay out money to certain parties upon a note; but that none of these facts were known to the board of directors, except that of the payment of money after banking hours, which was duly explained by the president, who gave as-

surances that the note was regularly discounted, and was all right, and no notice was given to the defendant. *Held*, that defendant had no reason to complain of an instruction that, if the bank knew of the fraudulent purposes for which the checks in question were used, it could not recover; but that a mere overdraft, without any fraudulent intent, would not be an act which would affect the bank's right of recovery upon the bond.

**2. SAME.**

Knowledge by the cashier and a director that the president's account was frequently overdrawn, that his checks were carried as cash items, and that money was paid to parties after banking hours, did not amount to a default under the bond, unless acquired by such officers in the course of the business of the bank.

**8. SAME.**

After a receiver for the bank had been appointed on January 22d, and government experts and a national bank examiner commenced an examination of the bank's affairs, the defalcations of the president began to be apparent some time between the 2d and 9th of February, and 27 days after his appointment the receiver gave written notice thereof to defendant, and that indemnity would be required. *Held*, that the notice was not so late as to require the court to take from the jury the question of its sufficiency, and that the jury were properly instructed that the requirement of the bond that notice should be given "immediately" of the discovery of any default meant that the same should be given "as soon as reasonably practicable and with promptness," and that, if the receiver gave the required notice within a reasonable time after the discovery of the default, it was sufficient.

**4. SAME—NOTICE OF DEFAULT.**

A notice referring to the certificate issued by defendant guarantying the fidelity of the president of the bank, and to its bond by number, and informing defendant that the president had been found in default to the bank, and that indemnity to plaintiff as receiver of the bank would be required, was sufficient in form to meet the requirements of the bond that upon discovery of any default the bank should give notice to defendant in writing.

**5. SAME—PROOF OF CLAIM.**

Full particulars of the bank's claim under the bond not being fully developed for six months after the appointment of the receiver, during which time the examination of the bank's affairs was being made, the filing of a claim under the bond at the end of that time was a sufficient compliance with the requirement of the bank that any claim thereunder should be filed "as soon as practicable" after notice of default.

**6. SAME—EVIDENCE—LETTER OF CASHIER NOT ADMISSIBLE AGAINST BANK.**

A letter written by the cashier of the bank, without the authority of the board of directors, upon the renewal of the president's bond, certifying that all moneys handled by the president had been accounted for, that he had performed his duties in a satisfactory manner, and that no reason was known why defendant's guaranty bond should not be continued, was inadmissible in evidence on behalf of defendant, because not binding upon the bank.

In Error to the Circuit Court of the United States for the District of Kentucky.

This action was brought by the receiver of the German National Bank against the Fidelity & Deposit Company of Maryland to recover upon a bond given to indemnify the bank against loss by fraudulent acts of J. M. McKnight as president thereof. It appears in the record that on June 1, 1894, McKnight was elected vice president, and executed his bond for one year. Upon June 1, 1895, he was elected president, and the bond was renewed by him as president, and was again renewed for the further period of one year. The petition sets up various defaults, aggregating $18,742.74, and prays judgment for the penalty of the bond in the sum of $10,000. The bond con-

tained, among others, the following provisions: "Whereas, the employé has been appointed in the service of the employer, and has been assigned to the office or position of * * * by the employer, and application has been made to the Fidelity and Deposit Company of Maryland for this bond; and whereas, the said employer has delivered to the company a certain statement, and it being agreed and understood that such statement constitutes an essential part of the contract hereinafter expressed: Now, therefore, in consideration of the payment of the sum of —— dollars, lawful money of the United States of America, to the company as a premium for the term commencing at the date hereof and ending on the —— day of ——, eighteen hundred and ninety ——, at 12 o'clock noon, the company does hereby agree that it will, within three months after receipt of proof satisfactory to its directors, and subject to the conditions hereinafter expressed, reimburse the employer to an amount not in excess of the penalty of this bond, for such pecuniary loss as the employer shall have sustained by any fraudulent act or acts committed by the employé during the continuance of this bond in the performance of the duties of his said office or position, or of such other position as he may be subsequently appointed to or called to fill by the employer in said service, of money, securities, or other personal property belonging to the employer, or for which the employer is responsible. This bond may be continued from year to year, at the option of the employer, at the same or an agreed premium rate, so long as the company shall consent to receive the same, in which case the company shall remain liable for any dishonest act of the employé occurring between the original date of this bond and the time to which it shall have been continued. This bond is issued and continued upon and subject to the following conditions and provisions: * * * That the employer shall immediately give the company notice, in writing, of the discovery of any default or loss hereunder, and shall file with the company his or their claims hereunder, with full particulars thereof, as soon as practicable thereafter; and no claim which shall not be so filed by the employer with the company within six months after the expiration or cancellation of this bond, or within six months after the employé shall have ceased to be in the employer's service, shall be payable hereunder. * * * That, upon notification to the company of any loss hereunder, the company's liability shall thereupon terminate as regards any subsequent act of the employé. That the employer shall observe, or cause to be observed, due and customary supervision over the employé for the prevention of default; and, if the employer shall at any time during the currency of this bond condone any act or default on the part of the employé which would give the employer the right to claim hereunder, and shall continue the employé in its service, without written notification to the company, the company shall not be responsible hereunder for any default of the employé which may occur subsequent to such act or default so condoned. * * * That there shall be a complete inspection of the accounts and books of the employé on behalf of the employer at least once in every twelve months from the date of this bond, such inspection to include examination of all cash and securities of which the employé shall have custody or charge. That the employé has not, within the knowledge of the employer, been at any time in arrears or default either in this or other employment. That the employer shall at once notify the company on becoming aware of the employé being engaged in speculation or gambling, or indulging in any disreputable or unlawful habits or pursuits. * * * That the company may, upon giving one month's notice, in writing, to the employer, cancel its responsibility hereunder in so far as it concerns the acts or defaults of the employé subsequent to the end of such month; in which event it will, upon request of the employer, refund the proportion of the premium paid for the unexpired term of this bond."

The amended answer recites the provisions of the bond, and sets up that neither the bank nor the receiver ever gave notice to the Fidelity & Deposit Company of Maryland of the defaults as required; that the bank did not observe the due and customary supervision over McKnight; that the vice president, who was also a director, knew of the embezzlements of McKnight, yet neither the bank nor the receiver notified the company until long after the bank was closed, in January, 1897; that the receiver did not file his claim

against said company until the 18th of February, 1897; that this notice did not give the particulars of McKnight's default, and that defendant did not fully know the same until the 2d of July, 1897; that Rudolph Reutlinger was teller and cashier, and as such had charge of such financial affairs as pertained to said offices; that Adolph Reutlinger was vice president, and was daily in the bank, and thoroughly familiar with all its business affairs, and with the acts and defaults of said McKnight as president; that the directors were also familiar with McKnight's overdrafts; that McKnight's defaults and embezzlements were known to the directors, who allowed them to go on without the knowledge of the Fidelity & Deposit Company; that during the time McKnight was in office the books were out of balance about $3,000; that the directors and officers allowed McKnight to be constantly overdrawn in his personal account; that his overdraft, January 18, 1896, was $1,340.14, and on June 8, 1896, it was $626.23, and that, day in and day out, he was overdrawn, of which fact the directors had knowledge, and these irregular acts and defaults were not known to said defendant, otherwise it would have canceled the bond; that before the renewal of the bond, in 1895–1896, it wrote the bank to ascertain if McKnight had been conducting himself properly, and was informed by the cashier that McKnight had discharged his duties faithfully; that such statements were made with the knowledge of the directors, but that said statements were false and fraudulent, which at the time was unknown to said defendant; and that thereby the company was led to renew the bond, which otherwise would have been canceled. And by another amended answer it is charged that McKnight's wrongdoings were known to the directors of the bank when they occurred, or within a few days thereafter, but that said defendant was not notified until long after the bank went into the hands of a receiver. Replication was filed, and the case went to trial, resulting in a verdict for plaintiff. Testimony was offered tending to show various transactions of McKnight's in the course of his business in the bank; among other things, the overdrafts of McKnight, and that checks were given by him, and carried by the cashier as cash items, at the direction of McKnight, for a considerable length of time. There is also testimony tending to show that McKnight, while a candidate for office of mayor in the city of Louisville, which office was to be filled by the council of said city, obtained $1,000 for one Edmunds, in bills of $100 each, which money was obtained on Edmunds' check, he, at the time, having no account at the bank as an individual, but Edmunds & Co. had an account there. Edmunds testified he understood the check was to be taken care of by McKnight. It was also testified that a loan was procured of $2,000 to Britt and Reeder, which money was obtained at the bank after banking hours, and that McKnight said he had a big scheme on hand, and it appeared this money was given for the purpose of obtaining an illegal contract with the councilmen as to possible legislation which might come before them. McKnight, on being asked for an explanation of the matter, claimed that it was all right; that the note was good; that the matter was brought before the board of directors, where McKnight made an explanation to the same effect, and that it seemed to satisfy the board.

E. T. McDermott, for plaintiff in error.
Wm. M. Smith, for defendant in error.

Before LURTON, DAY, and SEVERENS, Circuit Judges.

DAY, Circuit Judge, after thus stating the case, delivered the opinion of the court.

1. It is unnecessary to enter into a detailed account of the various defaults, or comment upon the knowledge thereof of the bank directors, as there was a conflict of testimony upon that subject, upon which the court charged the jury as follows:

"There was also evidence tending to show that J. M. McKnight was president of the bank, and the other officers of the bank, including the directory, had entire confidence in his honesty and integrity up to the time the bank

was closed; that none of them had any knowledge that any act of his in the management of said bank was fraudulent or dishonest, until after the closing of the bank; that said bank had a discount committee, who regularly examined and passed on the papers of the bank, as required of such committee, and the directory of said bank undertook to make a monthly investigation—sometimes twice a month—of the affairs of said bank, and required the president to go through the same with them, and make a full report thereon: that some of the directors were in the bank almost daily, inspecting its affairs, and that they did at all times observe due and customary supervision over said president for the prevention of default; that none of the officers of said bank, including the directory, had any knowledge of the various checks set up in the petition as fraudulent, and that were charged to the account of other parties than those drawing them, or on whom they were drawn, except the clerks who charged them up to said account as stated, and there was evidence tending to show that they charged them up to such accounts by the direction of McKnight, the president, and except, further, R. E. Reutlinger, the cashier and teller of said bank, knew of said checks when they came into said bank, and was instructed to hold them as cash items by McKnight, but further than this he had no knowledge. As to the $2,000 Britt and Reeder note, there was also evidence tending to show that R. E. Reutlinger was required to stay at the bank until after banking hours, and was directed by McKnight to and did lay out the $2,000 on said note to said parties, but that further than this he had no knowledge thereof. There was also evidence tending further to show that said R. E. Reutlinger informed his father, Adolph Reutlinger, vice president, of the payment of this $2,000 that night, and that said Adolph Reutlinger made inquiry of McKnight to explain the transaction; that thereupon McKnight told him that said parties were good and solvent, and the note was regularly discounted, and all right, and that, if required, Gaulbert or Whallen would sign same with them, and that he (McKnight) would guaranty the payment thereof; that the parties were obliged to have the money that night, and he so kept the bank open to let them have it. There was evidence tending further to show that said Adolph Reutlinger then went before the directory, and told them what McKnight had said in regard to this note, and said to them that he had made some investigation, and could not find that these parties had any property; that he was unable to say whether or not they were good, and that thereupon McKnight came before said directory, and made the same statement to them that he had made to Adolph Reutlinger, assuring them that the note was good, and that said directors believed him, and relied on his statement, and so passed the note; that there was no other evidence tending to show any further knowledge of said note, or its true character, by the officers or any of the directors of the bank, than is herein stated, except in the testimony of Jacob Reisch, one of the directors, that some short time after the execution of said note Adolph Reutlinger told him what he had learned thereof as herein stated, and further he says that said Reutlinger told him that the money was used in the mayor's race. This latter statement Adolph Reutlinger denied in his evidence."

Upon the subject of the duty of the bank, under these circumstances, to notify the company of these transactions, that it might end its obligations under the bond, if it saw fit to do so, the court charged the jury:

"Now, I suppose in this case, if the bank had known that McKnight was making these drafts for these various fraudulent purposes, such as buying up councilmen, buying up aldermen, paying his own personal debts; if the bank had known that, and consented to it,—there would not have been a fraudulent act by McKnight for which the bank could recover against this company. But if you believe, from the evidence, that the bank did not know of the fraudulent purposes for which the overdrafts were made, if the overdrafts were made in connection with this matter,—if you believe the bank did not know the fraudulent purposes,—then that changes the result; because, if the bank did not know, and still consented to it, it would not relieve the act of McKnight from the character of being a fraudulent act. So that, as I view

the case (you must remember, however, that you are the sole judges of the evidence in this case and its credibility), as I view this case, however, there would be no fraudulent acts upon McKnight's part (limiting my observations now to the overdrafts), there would be no fraudulent acts upon his part merely in an overdraft, if there were no fraudulent intent behind it, which was concealed from the bank."

We think this instruction as favorable as the company was entitled to, and under it, if the jury found that the bank had knowledge that McKnight was doing the acts in question for fraudulent purposes, there could be no recovery upon the bond. We must remember that this obligation was intended to secure the bank against the fraudulent conduct of McKnight in the performance of the duties of his office or position; that McKnight's action, in order to require notice to the company, must have been "of the discovery of a default or loss under the bond." While McKnight might have been guilty of reprehensible conduct, it would not require notice unless such as might result in the loss of security or money or personal property of the bank by fraudulent conduct in the performance of his duties to the bank. Such conduct as amounts to a default under the bond the employer is bound to report, and if he condones or continues the employé in his service, without written notice to the company, the latter would be discharged from responsibility. Misconduct which would not amount to a fraudulent act affecting the duties of the officer of the bank would not require notice unless it came within that clause of the bond which requires the employer to notify the company when the employé engages in gambling or speculation, or indulges in disreputable or unlawful habits or, pursuits. Whether McKnight's conduct was of this character the court left to the jury to determine. They must have found that there was no such misconduct as would avoid the bond while the bank was in operation, and which it was the duty of the bank to report to the company. In this connection it is averred that the court erred in saying that this knowledge must be the knowledge of the bank, intending thereby to exclude the knowledge of individual directors. In the charge above quoted, as to the knowledge of the bank directors, we have already said we find no error. We have carefully examined the record, and find no knowledge brought home to the directors individually, or the cashier in his individual capacity, which was not brought to the attention of the board, which would amount to a default under this bond. Such knowledge, in order to be binding upon the bank, must have been acquired in the course of business of the bank transacted by such officer or director. It is not necessary to examine the numerous authorities cited upon this proposition. They are well summed up in Boone, Banking, § 132:

"Notice to the directors of a bank when assembled as a board is notice to the bank; nor can any subsequent change of directors require a new notice. * * * And notice to one or more of the directors, when engaged in the business of the bank, will be deemed notice to the bank."

The testimony shows no such knowledge of McKnight's conduct, acquired in the bank's business by individual directors or officers of the bank, and not known to the board, as would entitle the company to notice. As was said in Surety Co. v. Pauly, 170 U. S. 147, 18 Sup. Ct. 558, 42 L. Ed. 982:

"It may well be held that the surety company did not intend to require written notice of any act upon the part of the cashier that might involve loss, unless the bank had knowledge, not simply suspicion, of the existence of such facts as would justify as careful and prudent man in charging another with fraud or dishonesty. If the company intended that the bank should inform it of mere rumors or suspicions affecting the integrity of O'Brien, such intention ought to have been clearly expressed in the bond."

2. Upon the question of notice of McKnight's default it is strenuously argued that the notice given by the receiver after he took possession of the bank is not such notice as is required, and for that reason there can be no recovery upon the bond. The bank was closed on the 17th of January, 1897. The receiver was appointed on the 22d of January, 1897. On the 18th of February the receiver gave the following notice:

"Louisville, Ky., February 18, 1897.

"To the Fidelity & Deposit Company of Maryland, Baltimore, Md.—Gentlemen: Referring to the certificate No. 4,043, issued from your security department, guarantying the fidelity of Jacob M. McKnight, president of the German National Bank, under your bond to him, No. 5,002, issued June 1, 1894, in favor of such bank, we hereby notify you that said Jacob M. McKnight, as president, has been found in default to this bank, and that you will be required to make indemnity to me as receiver to the extent of said bond.

"Yours truly,     R. H. Courtney, Receiver German National Bank."

When this notice was offered in evidence, it was objected to, the attorney for the defendant stating:

"We have no doubt he sent it [the notice], and make no point on that, but we desire to object to the admission of it, as not being the notice required in the contract, and therefore we received no notice whatever."

Exception was taken to the portion of the charge relating thereto on the same ground that the introduction of the notice in testimony was taken, viz. that it was not such notice as was required by the contract, and was, therefore, misleading. Neither in this exception, nor when the notice was offered in testimony, was it objected that the notice was not early enough in point of time, but in the assignments of error this averment is added. It may well be doubted if this is not extending the assignment of error beyond the exception taken. Assignments of error cannot broaden an exception, and will not be considered unless called to the attention of the court by proper exceptions. We are of opinion, however, that the court fairly left this question to the jury. It is testified by Mr. Courtney that immediately after the bank passed into his hands as receiver:

"I began to ascertain the defalcations. The experts—Mr. Hays, a government expert, and Mr. Escott, a national bank examiner—were at work immediately after Mr. McKnight's arrest. I kept pace with their investigation. It was almost immediately after the bank closed that these defalcations became known; not all of them, but enough to ground the claim upon. I had that notice of February 18, 1897, mailed to the office at Baltimore. It is my impression that I mailed a like notice to the agent here."

The expert Mr. Escott testifies:

"We began to get these shortages about two or three weeks after the bank was closed. They were discovered from time to time. I began to discover them in two weeks."

If, as Escott says, they began to discover the shortages two or three weeks after the bank was closed, that would mean the discovery was

first made between the 2d and 9th of February, 1897. The court left this question to the jury under the following instructions:

"The defendant insists upon this clause of the contract between it and the bank that 'the employer shall immediately give the company notice in writing of the discovery of any default or loss hereunder, and shall file its or their claims hereunder, with full particulars thereof as soon as practicable thereafter, and no claim which shall not be so filed by the employer with the company within six months after the expiration or cancellation of its bond, or within six months after the employé shall have ceased to be in the employer's service, shall be payable hereunder.' In considering that clause of the contract between these parties, I do not think the word 'immediately' should be given such construction as that it would mean instantly, but I believe it conforms with the views of the supreme court and the authorities generally to tell you that it means that it was the duty of plaintiff in this case to give, as soon as reasonably practicable, and with promptness, notice of the discovery of any default. It did not mean that as soon as one was suspected that notice should be given; but if you believe, from the evidence, that within a reasonable time after the receiver in this case (and you must remember that he is the receiver merely, and that he knew nothing about the management of the bank, nothing of its affairs, until he was appointed), if you believe that, within a reasonable time after he discovered—actually discovered—a default, he gave the notice of the 18th day of February, 1897, you are at liberty to infer that that part of the obligation of this bond has been performed."

We think there was not such a lapse of time from the time the receiver began to discover these defaults until he gave the notice of February 18, 1897, as would require the question to be taken from the jury. We have already said no notice is required until the bank had knowledge of facts which would justify it in charging dishonesty. In the Pauly Case, supra, while it is true the bond says that notice must be given as soon as practicable, instead of immediately, Mr. Justice Harlan says:

"It was left to the jury to determine when the receiver first acquired knowledge of acts indicating fraud or dishonesty on O'Brien's part, and they found, in effect, that he had no knowledge of any such act until after the report by the expert bookkeepers, made about or a few days before May 23, 1892. The trial court went far enough when it said, in response to an inquiry by a juror, that notice given May 23, 1892, of a fraud by the cashier discovered as early as March 2d,—the day on which O'Brien left the receiver,—was not as soon as practicable after the receiver acquired knowledge of the facts."

Unless the lapse of time is so long as to be obviously a noncompliance with the contract, the question is one for the jury. In May, Ins. (3d Ed.) § 462, it is said:

"If the notice be required to be 'forthwith,' or 'as soon as possible,' or 'immediately,' it will meet the requirement, if given with due diligence under the circumstances of the case, and without unnecessary and unreasonable delay, of which the jury are ordinarily to be the judges. To give the word a literal interpretation would, in most cases, strip the insured of all hope of indemnity, and policies of insurance would become practically engines of fraud. Thus, notice within eight days after the fire, and within five days after it came to the knowledge of the insured, has been held to be reasonable. So, where the fire happened on the 10th, and notice of loss, dated the 11th, reached the insurers on the 15th of the same month. But a delay of four months in one case, of thirty-eight days in another, of twenty days in another, and of eleven days in another, there being no sufficient excuse therefor, has been held to be unreasonable. Yet where the insurers had, contrary to their agreement, refused to issue a policy, they were held to have waived their right to object to a notice sent eleven months after the loss. Whether due diligence has been used in giving the notice is a question which is ordinarily left to the jury, to be found

from all the circumstances in the case. But, where the facts and circumstances bearing upon the question of due diligence are not in dispute, it becomes a question of law for the court."

In Donahue v. Insurance Co., 56 Vt. 374, notice of a fire was required to be given forthwith. It was held that such notice must be given with due diligence, and within a reasonable time; and, although notice was given 22 days after the fire, it was held a question for the jury as to whether it was given forthwith. It was said by the supreme court in the Pauly Case, supra, that an indemnity contract is to be construed most favorably to the insured. In speaking of fire insurance policies, under consideration in the Vermont Case, supra, the judge said (page 380):

"The condition that the insured should give the company notice forthwith should be construed liberally in favor of the insured."

In Association v. Smith, 126 Pa. St. 317, 17 Atl. 605, Chief Justice Paxson, in delivering the opinion of the court,—this being a case in which an injury was received by one holding an accident policy on September 4, 1887, notice being given to the company October 19th, the policy requiring immediate notice of the injury,—said:

"The word 'immediate,' in the contract, must be construed to mean within a reasonable time thereafter, under all the facts and circumstances of the case; and what is a reasonable time must be decided by the jury, unless, as before observed, the delay has been so great that the court may rule it as a question of law."

In Bennett v. Insurance Co., 67 N. Y. 277, speaking of a case where the notice was required to be given forthwith, and it had not been given until 26 days after, Judge Earl said:

"The word 'forthwith' does not here mean immediately or instantaneously after the fire. It means, and has been held to mean, within a reasonable time or with reasonable diligence after the fire. New York Cent. Ins. Co. v. National Protection Ins. Co., 20 Barb. 468; Inman v. Insurance Co., 12 Wend. 452."

The word "immediate" is certainly no stronger than the word "forthwith," or the expression "as soon as possible." In Insurance Co. v. Flynn, 98 Pa. St. 628, it was held that 30 days' delay will not prevent the submission of the question to a jury in a policy which required proofs to be submitted as soon as possible. In McFarland v. Association, 124 Mo. 204, 27 S. W. 436, the supreme court of Missouri held:

"Where an accident policy requires 'immediate' notice of the death of the insured to be given, and provides that the same shall be given by letter, notice given within ten days after the death is sufficient. The word 'immediate' will, in such cases, be construed to mean 'within a reasonable time.'"

See, also, Insurance Co. v. Lippold, 3 Neb. 391; Harnden v. Insurance Co., 164 Mass. 382, 41 N. E. 658; Insurance Co. v. Scammon, 100 Ill. 645.

Assuming that the defalcations were becoming apparent to the experts so that they began to discover them two or three weeks after the bank was closed, we cannot say, as a question of law, that such facts had been discovered as would justify a prudent man in charging another with dishonesty so as to require notice, and we think the question was properly left to the jury under the instruc-

tions given. Some cases have been cited in which it seems a more restricted view of this requirement is taken, but we think the opinion here expressed is more consonant with the intention of the parties and the purposes of indemnity contracts. · In Bouv. Law Dict. it is said of the word "immediate":

"Strictly it implies not deferred by any lapse of time, but as usually employed it is rather within reasonable time, having due regard to the nature and circumstances of the case."

3. Nor do we think there is any reasonable objection to the form of the notice given. The purpose of the notice was to enable the indemnity company to terminate its liability, and to obtain such remedies as it might see fit to adopt against the defaulter. The notice sent was general in its character. It advised the company of the default, claimed the full amount of indemnity, and no objection was taken to it.

4. It was further objected at the trial that the proof of claims, which was required by the bond to be made out as soon as practicable after the default, was not furnished in time. This claim was filed in July, 1897. During all that time the investigation was going on, and the books of the bank were being examined. So far as the testimony discloses, the full particulars of the claim were not developed until July so as to be capable of proof.

5. It is claimed the court erred in excluding a certain letter signed by Reutlinger, cashier, concerning McKnight's performance of his duties as president. The president of the Fidelity & Deposit Company, on the 15th of May, 1896, wrote the bank as follows:

"Baltimore, Md., May 15, 1896.

"To German National Bank, Louisville, Ky.—Dear Sir: We hereby notify you that bond No. 5,002 for $10,000, issued by this company on behalf of Jacob M. McKnight, in your employ as president, will expire on the 1st day of June next. The premium, forty dollars, should be paid on or before the date of expiration, otherwise the bond will lapse. Kindly have the certificate below filled in and signed, and forward with remittance for premium to Jos. O. Odiorne, general agent, when the renewal receipt will be sent to you.

"Yours, respectfully,          Edwin Warfield, President."

The certificate referred to was filled in by the cashier, having been inclosed in blank form in the letter from the company, and was returned, of date May 29, 1896, to the fidelity company, and is in the following language:

"The Fidelity & Deposit Company of Maryland: This is to certify that on the ——— day of ———, 189–, the books and accounts of Mr. J. M. McKnight, is president, in our employ, as has no books and accounts were examined by us, and we found them correct in every respect, and all moneys handled by him accounted for. He has performed his duties in an acceptable and satisfactory manner, and we know of no reason why the guaranty bond should not be continued. His salary is now $4,500, and he is employed as president.

"Signature:          R. E. Reutlinger, Cashier, Employer.

"Dated at Louisville, Ky., May 29, 1896."

This certificate, signed by the cashier, was excluded, because there was no showing that there had been special authority from the board of directors authorizing or directing the cashier to fill out and send it. It is earnestly argued that the cashier, by virtue of his office, and having charge of the correspondence of the bank, had full

authority to answer this communication in the way which he did; and, being in the apparent scope of his authority, the bank is bound by it. A majority of the court are of opinion that the case is ruled by Surety Co. v. Pauly, supra, in which the president wrote a similar letter for the cashier, and it was held that the president of the bank, in the absence of express authority, could not bind the bank. There is no showing that the bank authorized the cashier to fill out the certificate and return it. It is not a case of answering a usual letter of the bank in the course of its business. A certificate as to the prior conduct of McKnight was inclosed, and an answer required. Nothing is shown in this case showing express authority, and we do not think such inheres in the duties of the office of cashier without special authority.

Other errors are assigned, which either fall within the principles already laid down, or are not of sufficient weight to require further attention. Finding no error in the record of the proceedings in the court below, the judgment is affirmed.