Argued May 8; affirmed May 28, 1946

## HADDOCK CONSTRUCTION CO. *v.* WILBER ET AL.

### (169 P. (2d) 599)

*Robert F. Maguire* and *James G. Smith,* of Portland (Maguire, Shields & Morrison, of Portland, on brief) for appellant.

*John Lichty,* of Portland, for respondent.

Before Belt, Chief Justice, and Rossman, Kelly, Bailey, Brand and Hay, Justices.

KELLY, J.

For the purpose of securing the plaintiff from any loss or damage by reason of the failure of the defendant Fred S. Wilber, to carry out the terms of his subcontract, the defendant Fred S. Wilber, and the defendant Saint Paul-Mercury Indemnity Company made, executed and delivered to plaintiff their bond and undertaking by which they bound themselves jointly and severally unto the plaintiff in the sum of $32,763.00.

This bond contains the following provisions:

"The foregoing obligation, however, is limited by the following express conditions, the performance of each of which shall be a condition precedent to any right of claim or recovery hereunder.

1. Upon the discovery by the Obligee or by the Obligee's agent or representative, of any act or omission that shall or might involve a loss hereunder, the Obligee shall give immediate written notice thereof with the fullest information obtainable at the time to the Surety at its home office." The bond in suit was executed on July 2, 1942.

Plaintiff contends that it did not discover any act or omission on the part of Wilber which should or might involve a loss under the contract in suit until after February 27, 1943.

We do not so construe the record. We quote from the testimony of Mr. Thomas Holmberg, chief inspector for the government of the work involved herein:

Q Did you observe the manner in which Mr. Wilber, who is sitting here at my left, was applying the roofing materials to the roofs he was covering between July 31 and about the 20th of August?

A I did.

Q What was he doing to those roofs?

A He was not properly spot mopping. He was using the mop almost dry, the man who was putting the roof on, and there was not enough pitch to stick to the roof.

Q When you say 'pitch', you mean what we call cement or tar?

A No asphalt, or tar, or pitch.

Q Did you call this to Mr. Wilber's attention?

A I did.

Q What else did you do concerning it?

A I took Mr. Wilber over to Sites 5 and 4, to show him how the other roofers were doing the work, and I asked him to follow their way if he

did not know any better than the way he was doing, and then I brought him back to this Area Six where he was roofing at the time.

Q Did you tell anybody in the Haddock Construction Company office about your discovery, that he was not putting enough pitch on?

A Yes, several times. Mr. Weber was supposed to be superintendent over all the crews.

Mr. Maguire: Is that Weaver or Weber?

A Weaver.

Mr. Lichty: Q Did you talk to Mr. McCaslin about it?

A I did, yes.

Q Did you ever talk to Mr. Blanchard about it?

A No, but I gave Mr. McCaslin a letter stating my objections to what I found down there.

Q Did you notice Mr. Wilber's cooperation after you showed him how it should be done?

A I noticed it, and when I was on the job they were doing better, and when I walked off they were back at the same thing, because I used to come back and watch them.

Q Did you further advise any one in the Haddock Construction Company immediately after you watched them and saw they were not complying with your instructions?

A Every day when I contacted them I mentioned they were not following out the specifications on the roofing.

Q I believe the evidence shows the last roofs were completed about the last of September, the 29th of September, or some such date; were you inspecting the work all during the month of September?

A Yes, sir.

Q Did Mr. Blanchard or Mr. McCaslin ever discuss with you why Mr. Wilber was not made to correct his work?

A Not that I recall. Not that I remember of.

Mr. Maguire: Just a minute. You mean while this work was going on or after?

A  Yes, sir.

Mr. Lichty.  Q  What did you tell these men?

A  That the work would not be acceptable the way it was being done.  Shortly after I had those contacts with Mr. Wilber there were fifteen roofs were off one night.  Some portions off, and some partly torn off.

Q  Was that while he was still working there?

A  Yes, while he was still there.''

Neither Mr. McCaslin nor Mr. Weaver was called as a witness.

Clearly the facts to which witness Holmberg called the attention to both Mr. McCaslin and Mr. Weaver, who were at that time the representatives of plaintiff, required written notice to defendant indemnity company by the plaintiff obligee in the bond in suit.

Mr. R. A. Blanchard was employed by plaintiff upon the project in suit, known to this record as the McLaughlin Heights project.  He was in charge of all the subcontractors.  The project was divided into site areas.

The subcontract with defendant Wilber applied to ''978 dwelling units at site area number 6.''

On August 24, 1942, plaintiff, through its Manager of Housing Construction Mr. H. R. Ketell, sent a letter to defendant Wilber as follows:

''Haddock Construction Co.
Engineering and Building Contractors

P. O. Box 649                                     Phone
Vancouver, Wash.                    Vancouver 3200
                    August 24, 1942

Mr. Fred S. Wilber       Re: Wah—(D-Wash. 45122)
2111 N. E. Union Ave.         cph—110
Portland, Oregon                 Site Area No. 6

Dear Mr. Wilber:

You have a bonded contract with us to deliver roofs as per plans and specifications, and it has

come to our attention that you are not putting sufficient tar under the paper to hold it down. In fact, some of the roofing seems to be blowing loose at the present time.

We herewith request that you put more tar under the roofing paper. We want you to be more careful in this regard.

Of course, we realize that you are bonded and have to repair the defects, but we are making this suggestion for your own best interests as well as ours.

Very truly yours,

Haddock Construction Co.

By H. R. Ketell

HRK:vb    Manager Housing Construction.''

In his testimony, Mr. Blanchard made the following statement of the circumstances that brought about that letter:

"This letter arose by having brought to our attention that the roofing was defective, or, at least, was blowing loose on some of the houses and telephone calls to Mr. Wilber were not always successful because he was not always in his office and this letter was written to him by Mr. Ketell, which speaks for itself, and calling his attention to that fact."

Mr. Blanchard further testified that after the above letter was written, defendant Wilber "came out to the job and in those instances was apologetic over the situation and offered to correct it immediately, or as quickly as he could, and he expressed himself as very cooperative in attempting to rectify the situation."

According to Mr. Blanchard's testimony, the reason or excuse defendant Wilber gave for the defective work was the inexperience of the workmen, difficulty in getting workmen and the fault of the foreman.

We are unable to convince ourselves in the light of the foregoing uncontradicted state of the record that until February 27, 1943, plaintiff was unaware of any act or omission on the part of Wilber which might involve loss under his subcontract. On the contrary, we think that it is plainly evident that as early as August 24, 1942, the agents and representatives of plaintiff had discovered acts and omissions on Wilber's part which might involve a loss under the terms of his subcontract.

■■ It is further urged by plaintiff that the construction which should be given to the condition of the bond in suit requiring immediate written notice of any act or omission that might involve a loss is that such written notice should be given within a reasonable time after the discovery of such act or omission; and that what constitutes a reasonable time for giving such notice is a question for the jury.

We think that the approved construction of the provision under consideration is as stated by plaintiff; but whether a reasonable time has elapsed before the required notice was given is for the court to decide as a matter of law where, as in the case at bar, there is no conflict of testimony, and differing conclusions, inferences or deductions cannot be drawn from the testimony.

■ In the case at bar, the required written notice was not given defendant indemnity company by plaintiff until after February 27, 1943, namely, on or about March 3, 1943, when more than six months had elapsed since the obvious and uncontradicted discovery by plaintiff of acts and omissions on Wilber's part which might involve a loss.

In the meantime, defendant indemnity company

had consented to the closing of a joint bank account with said indemnity company and defendant Wilber, by the terms of which, defendant indemnity company controlled the withdrawals from said joint bank account.

The release of said joint bank account followed the receipt by defendant indemnity company of a letter from plaintiff, of which the following is a copy:

"November 5, 1942.

St. Paul-Mercury Indemnity Co.
Failing Building
Portland, Oregon

Gentlemen:

Your company has prepared a release referring to the subcontract of Fred S. Wilber, in the amount of $32,763.00, for the roofing of 978 dwelling units in Site Area 6, project Wash-45122 the prime contract for which we hold.

Your bond covering the faithful performance and payment of labor and material bills incurred by this subcontractor has attending it the responsibility for correction of any defective workmanship or material for a period of one year after the acceptance of the dwelling units constructed. This company is willing to admit completion by this subcontractor of his subcontract generally but is unable to release your company from any obligations or liability related to the general guaranty set forth in the Specifications. The work of this subcontractor is satisfactory to us at present but may not be deemed so by the Government at a later date in the event defects of workmanship or material appear.

Such conditions, however, should not militate against the receipt of funds by this subcontractor, over which you may have joint control. Accordingly, it will be appreciated if you will release him

any monies earned by reason of the performance of his subcontract.

Yours very truly,
Haddock Construction Co.
By
P. M. Girard,
Gen. Mgr.''

P. M. G. :d t
cc File
    X

We think that by the terms of the bond in suit, plaintiff was obligated to report to defendant indemnity company in writing within a reasonable time the information given to its representatives by witness Holmberg, and the fact that several of the roofs had actually blown loose as early as August 24, 1942. We also hold that plaintiff failed to make such report within a reasonable time.

The single assignment of error presented by plaintiff is to the effect that the trial court erred in directing a verdict in favor of defendant Saint Paul-Indemnity Company and against the plaintiff Haddock Construction Company.

In support of this assignment of error plaintiff urges six points upon each of which authorities are cited.

The first of such points is to the effect that insurance and surety bonds are to be most strictly construed against compensated sureties.

To this point plaintiff cites *Neilson v. Title Guaranty & Surety Co.*, 81 Or. 422, 159 P. 1151. The principle invoked is there stated by Mr. Justice Harris thus:

"The rule of *strictissimi juris*, which is usually available to those who become sureties without compensation, is generally relaxed when applied to a paid surety, and in this, as well as in most juris-

dictions, a hired bonding company must show that its rights have been injuriously affected before it can defeat its contract of suretyship."

As stated, we think defendant indemnity company's rights are shown by this record to have been injuriously affected by the release of its control over the joint bank account. Even though it could be said that the record does not affirmatively disclose the amount so released, it is certain that if notice had been given to defendant indemnity company of Wilber's default when the letter to Wilber of August 24, 1942, was sent, the indemnity company would have taken over supervision of Wilber's work and further defective construction would have been prevented.

The Washington case of *Wenatchee Orchard Syndicate v. Fidelity & Deposit Company of Maryland*, 143 Wash. 632, 255 P. 943, recognizes the rule urged herein by plaintiff, but upholds the position of the paid surety because there was no ambiguity in the language of the bond.

In the case of *Duke v. National Surety Co.*, 130 Wash. 276, 227 P. 2, 131 Wash. 700, 230 P. 102, the language of the bond did not conform to the statutory provisions, but by the terms merely indemnified the obligee bank against any loss or damage suffered through any dishonest act of its employees whether committed directly or by collusion with others.

The Washington statute provides that—

"The board of directors of each bank and trust company shall require its active officers and employees and such other officers as they shall designate, each to give a surety company bond, in such sum as the board shall specify and the state bank examiner shall approve, conditioned for the faithful and honest discharge of his duties and for the faithful application of all moneys, funds and valua-

ables which shall come into his possession, or under his control." Section 3239, Rem. Comp. Stat.

The court held that the bond should be construed to be a statutory bond controlled by the further provision of the Washington statute which is as follows:

"No bond required by law, and intended as such bond, shall be void for want of form or substance, recital or condition; nor shall the principal or surety on such account be discharged, but all the parties thereto shall be held and bound to the full extent contemplated by law requiring the same, to the amount specified in such bond. In all actions on such defective bond, the plainitff may state its legal effect in the same manner as though it were a perfect bond." Section 777 Rem. Comp. Stat.

In the case at bar, we are not confronted by any statutory provision. We have to construe only the bond and the contracts.

Point 2 states that a hired bonding company must show that its rights have been injuriously affected.

As stated, we think that the record before us discloses that because of the failure of plaintiff to give notice to defendant indemnity company within a reasonable time after plaintiff became aware of acts of commission and omission on Wilber's part which might cause loss, the rights of defendant indemnity company were injuriously affected.

In *Fitzgerald v. Neal*, 113 Or. 103, 231 P. 645, the surety did not claim to have been injuriously affected.

In *Leiter v. Dwyer Plumbing Co.*, 66 Or. 474, 133 P. 1180, it was not shown that plaintiffs were guilty of a breach of the contract.

In *Black Masonry & Constructing Co. v. National Surety Co.*, 61 Wash. 471, 112 P. 517, the court recogognized the rule that a compensated surety will not

be released from his obligation unless he has been prejudiced in fact by a breach of the contract so substantial as to work a pecuniary disadvantage to him or a deprivation of some protection or privilege preserved in the bond; but held that the advancement to the subcontractor by the contractor before any work had been done and the payment of $6,632.46 before any material was delivered and $9,571.19 before any payment was due, constituted such a departure from the contract as to release the surety on the subcontractor's bond.

In *Beebe v. Redward,* 35 Wash. 615, 77 P. 1052, the surety sought to be released from liability upon a contractor's bond because the building was not completed at the time specified therefor in the contract and because the owner suffered materialmen furnishing material to be used in the construction of the building to file liens thereon to secure payment for the material so furnished and that as one such lien was filed as early as December, 1901, the action, to have been in time, should have been commenced not later than six months from that date.

The court say that the obligation of the contractor to complete the building on the day named was subject to several contingencies expressly enumerated in the contract, and it was not shown that these contingencies did not happen.

The court also held that the owner might treat the filing of a lien by a materialman on the property as a breach of the covenants of the bond and sue at once; but he was not obligated to do so. It was expressly held that the owner could wait until the parties, who had personal knowledge of the facts, litigated the questions involved with respect to the sufficiency of the lien and the amount thereof, and a court of competent

jurisdiction had rendered a judgment thereon. The principle invoked in support of the recognition of such an option on the part of the owner is that the owner may waive the apparent breach of the contract caused by the mere filing of a lien. In the case at bar, we are not dealing with an owner, but with the prime contractor, a subcontractor and a surety.

In *Cowles v. United States Fidelity & Guaranty Co.*, 32 Wash. 120, 72 P. 1032, 98 Am. St. Rep. 838, the Washington court held that, despite a provision in the building contract, no alterations should be made except on a written order by the architects, the making of alterations without any such written order did not release the surety. The court expressly recognize that there is a conflict of authority on the proposition and say that no damage appears to have been done by the slight variance in the terms of the contract.

In *MacNear v. Malow,* 282 Mich. 239, 276 N. W. 433, the rule was recognized that failure to give notice promptly as required in the bond does not in and of itself release the surety unless the surety has been prejudiced or suffered loss by reason of such failure; but there the court held that the market value of the real property had declined **materially after** the ti⸱ when notice should have been, and before it was, given of the default in payments by the purchase for which payments defendant had become surety; and hence defendant suffered a substantial loss. For that reason, the Michigan court held that the failure of plaintiffs to comply with the terms of the conditional guaranty prevented recovery.

Point No. 3 states that plaintiff was not required to give the defendant, Saint Paul-Mercury Indemnity Company notice of a suspicion of an act or omission that would or might involve loss, but was only re-

quired to give notice when it became satisfied that an act or omission had actually occurred which would or might result in loss.

Two of the cases cited to this point involve bonds indemnifying banks against loss occasioned by fraud or dishonesty of its employees. The first of these is *American Surety Co. v. Pauly,* 170 U. S. 133, 18 Sup. Ct. 552, 42 L. Ed. 977, 987. There it was provided in the bond that the surety company should be notified in writing of any act on the part of the employee ''which may involve a loss for which the company is responsible hereunder, as soon as practicable after the occurrence of such act shall have come to the knowledge of the employer.''

That case was tried to a jury and the court say:

''It must be assumed from the verdict that, within the meaning of the bond, the loss was discovered the latter part of May, and that written notice of it was given as soon thereafter as was practicable.''

Claim or proof of loss was mailed to the surety company on June 24, 1892, and the receipt thereof was acknowledged July 8, 1892.

The second of the two cases, cited by plaintiff, of indemnity against loss occasioned by the dishonesty of an employee of a bank is the *United States Fidelity and Guaranty Co. v. Walker,* 248 Fed. 42. This was an action on a bond or contract by which the United States Fidelity & Guaranty Company obligated itself, subject to stated conditions, to make good and reimburse the Clanton Bank of Montgomery, Alabama, for such pecuniary loss as may be sustained by the bank within a period named by reason of the fraud or dishonesty of its cashier in connection with the duties of his office or position amounting to embezzle-

ment or larceny. The federal court held that by the terms of the bond no conduct of the cashier made the surety company liable unless it amounted to embezzlement or larceny. We quote from the opinion:

"This being so, the above quoted provisions as to the bank giving notice are not to be so construed as to require action by the bank when it was not so far informed of the conduct of its cashier and of the intent accompanying that conduct as to be aware that he was guilty of what amounted to larceny or embezzlement. The existence of mere suspicion of misconduct was not enough." Citing *American Surety Co. v. Pauly,* supra.

The distinction between the two cases last above discussed on the one hand and the instant case on the other is obvious.

*Maryland Casualty Co. v. Hall,* 125 Miss. 792, 88 So. 407, is also cited in support of point 3. In that case also the indemnity was effective against loss by reason only of an act of an employee constituting larceny or embezzlement.

In *Outlook Farmers Elevator Co. v. American Surety Co.,* 70 Mont. 8, 223 P. 905, by the terms of the bond Oscar J. Brown, manager of plaintiff, as principal, and defendant as surety, promised to reimburse plaintiff for such losses, not exceeding $3,000 as it might suffer by reason of any acts of fraud, dishonesty, forgery, theft, embezzlement, wrongful abstraction, or misapplication on the part of Brown in his capacity as manager.

Plaintiff charged that from October 1, 1916, to February 15, 1917, in violation of his duties and the by-laws of the elevator company, Brown engaged in purchasing and selling options and futures under such circumstances as constituted the transactions gambling

in grain; that the transactions were conducted in the name and upon the credit of the elevator company with the result that the funds of the elevator company to the extent of $6,973.88 were lost.

It was contended by defendant that plaintiff failed to give notice of its losses within the time limited in the bond. The bond provided that recoverable losses must be discovered within fifteen months at most after the termination of Brown's employment, and that notice of such losses must be given to the surety company within ten days after discovery.

We quote from the opinion:

"A provision requiring notice of loss within a specified period after discovery is recognized as valid, and, unless waived, must be complied with as a condition precedent to recovery upon the bond. (California Savings Bank v. American Surety Co., 87 Fed. 118.) That plaintiff gave notice to the surety company is established beyond controversy, but whether the notice was given within ten days after the losses were discovered is the question upon which counsel for the respective parties fail to agree. The testimony introduced by plaintiff tends to prove that the losses were not discovered until after the books of the commission house were audited and the audit received by the plaintiff on March 2 or 3, 1918, and it is uncontroverted that the notice was given on March 9 following.

\* \* \* \* \* \* \*

The bond did not call upon plaintiff to act upon suspicion but upon discovery of recoverable losses; that is to say, when it was reasonably satisfied that Brown had committed acts resulting in losses to plaintiff which were recoverable; or, stating the principle differently, when it had knowledge of the existence of such facts as would justify a careful and prudent man in charging Brown with the acts

of which complaint is now made." Citing American Surety Co. v. Pauly, supra.

"Under proper instructions the jury were left free to determine when the losses were first discovered, and with the general verdict supporting plaintiff's theory that the discovery was not made until March 2, or 3, 1918, we are not disposed to interfere."

In the case at bar, the uncontradicted testimony discloses that discovery by plaintiff of acts of omission and commission on the part of Wilber, which would or might result in loss, was made more than six months before notice thereof was given defendant indemnity company.

Point 4 is stated thus:

"The plaintiff was not bound to give notice of every defect in workmanship which may have occurred in the performance by Wilber of his contract, and if during the process of the work defective workmanship was discovered by plaintiff and as and when discovered plaintiff required Wilber to and he did remedy such defects then plaintiff was not under obligation to give the surety company any notice thereof."

To this fourth point, plaintiff cites three cases, namely: *Lazelle v. Empire State Surety Co.*, 58 Wash. 589, 109 P. 195; *Aetna Indemnity Company v. Waters*, 110 Md. 673, 73 A. 712; and *United States Fidelity & Guaranty Co. v. Means & Fulton Iron Works*, 63 Tex. Civ. App. 56, 132 S. W. 536.

The Lazelle case was an action upon a bond to recover for breach of a building contract. Plaintiffs alleged a breach of the contract in three particulars: Failure to supply proper material, furnish competent workmen, or to prosecute the work with diligence. The answer contained nothing other than denials. Defendant contended *inter alia* that the evidence failed

to show notice to the surety within the limitation of the bond. The provision of the bond as to notice required written notice of the contractor's default with a verified statement of particulars to be delivered at the home office of the surety within fifteen days. The contract provided for the completion of the building by January 8, 1909. It not being completed on January 21, due notice was given to the surety, and on February 4th, nothing having been done by the company, personal notice of the default was given to the Seattle agent of the company. The defendant then executed a written waiver of the requirement for delivery of notice at the home office, and agreed to accept notice at the Seattle office, and on February 11th, following this waiver, the plaintiffs, in the meantime having made several complaints of the manner in which the work was being done, the unskillfulness of the workmen, and the poor quality of the material, requested the surety company to take charge of the work and complete the contract. This was refused.

By December 1st, the owner knew of instances in which the contractor was avoiding the contract in some minor details. In that month it was noticed that he had arranged the second story of the dwelling so that the roof would be too high, and, his attention being called to the mistake, he was required to rectify it. None of these particulars were complained of by plaintiffs nor was there any claim of damage because thereof. The surety company contended, however, that these defaults constituted breaches of the contract, and that it was entitled to notice within fifteen days and that inasmuch as no notice thereof was given, it was released from liability.

We quote from the opinion:

"It has never been held that, every time a contractor put in a defective board which was changed

on his attention being called to it, or, sometimes sawed a timber off too short, or cut his joists too long, or erred in other minor details which on notice were all corrected, these constituted such 'breaches' of the contract as would relieve a surety not receiving notice. In building contracts substantial compliance is the requirement, and it may be assumed that, from time to time as the work progresses, there will be technical violations of the specifications which will require correction. Yet to hold that these were breaches of the contract, requiring notice, no loss having been sustained by the owner, would be a strict interpretation of the contract never followed by this court. The notice provision is inserted for the benefit of the surety. It is to give him notice of the doing or neglecting to do something by the contractor which will result in loss to the owner primarily, and thus subject the surety to a liability. And since the purpose of the provisions is protection to the surety, when it appears that notice is given in ample time to enable the surety to protect itself against loss or damage, it is sufficient, since it has accomplished that which it was the intent of the notice to accomplish. Hence the rule has been established that the surety cannot complain when it can show no loss or substantial damage by reason of the failure to receive notice, in the exact and technical language of the contract, or make it appear that its failure to receive notice has prevented it from taking proper steps for its protection." Citing authorities.

"The appellant interposed no defense of any loss it had suffered by what it claimed the lack of notice; it made no attempt to show anything it might have done to protect itself had it sooner known the character of the work, material, and workmen furnished under the contract; and since the damage complained of by the respondents would have been spared them had appellant acted when it did receive notice, we cannot find any prejudicial loss to appellant in this assignment of error."

As stated in the instant case, the rights of defendant indemnity company were prejudicially affected by the delay for more than six months on the part of plaintiff to give the required notice.

The doctrine of the case of *Aetna Indemnity Co. v. Waters,* supra, with reference to the duty of an obligee in a building contract bond to notify the surety of acts of the contractor likely to result in loss, is that the clause requiring such notice is in effect a forfeiture clause and therefore belongs to a class of provisions of which the courts are not disposed to make rigid application to circumstances not of the essence of the transaction.

In the case at bar, the acts and omissions of Wilber of which notice was not given to the surety until six months had elapsed were of the essence of the transaction.

In *United States Fidelity & Guaranty Co. v. Means & Fulton Iron Works,* supra, the bond was executed on January 13, 1904. Originally, the work was to have been completed on or about September 30, 1903, but time for its completion was first extended for sixty days and again extended until January, 1904. Thus it will be noted that the bond was not executed until after the time for the completion of the contract had expired. The Texas court held that this was sufficient to put the surety on notice; that up to that time for some reason the contract had not been complied with, and, if any information was desired by the surety, it should have made inquiry and by reason of the failure of the surety to make inquiry the silence of the obligee was not culpable. The question was whether the evidence was of such nature as to show that the obligee acted in good faith and that no fraud was perpetrated in failing to notify the guaranty company of the act

of the subcontractor in relation to the construction of the water tank and tower which the subcontractor had agreed to construct. That question was decided in favor of the obligee. The factual situation in that case differs materially from that which is presented in the instant case.

The fifth point submitted by plaintiff is to the effect that the failure to give notice of a certain default would only destroy liability for the particular default in question, but would not destroy liability for other defaults of which proper notice was given.

To this point, the case of *Shaw v. New Amsterdam Casualty Company*, 310 Pa. 213, 164 A. 916, is cited.

In that case, the bond was given to secure the payment of rent. The Pennsylvania court construed the provisions of the lease to contemplate a series of failure to pay, each being a default or breach within the meaning of the lease, unless the lessor on receipt of the rent or for other cause elected not to so regard it; that the parties did not intend that a default should consist merely in a failure to pay, but in a refusal to pay; each default stood alone requiring notice to be given the surety of such default within thirty days if it was to be held. All defaults prior to July were corrected. Plaintiff's claim began in July, 1931. Defendant was not prejudiced by plaintiff's failure to give notice of such prior defaults and their correction. In the instant case, as repeatedly stated, defendant indemnity company was prejudiced by the failure of plaintiff to give notice of Wilber's defaults prior to March 3, 1943.

To the fifth point, plaintiff also cites the case of *Maryland Casualty Co. v. Dunlap*, 68 Fed. 2d 289, which was an action upon a bond conditioned to secure the performance of a contract to erect a building in-

680

tended for use as a theater. The Main Street Corporation was the owner of the real estate in question and agreed to erect a theater on it. The two plaintiffs: Springfield Institution for Savings, which was the first mortgagee, and the trustees of the Dunlap Realty Trust, which trust was the second mortgagee, required and received the bond in question in order to make sure that the new building, on which they relied as part of their security, would be completed. When it was about half done, the contractor abandoned the work. The plaintiffs thereupon made entry to foreclose and afterwards the Dunlap trustees bought the property at foreclosure sale.

Upon the question of the alleged failure to give notice of defaults as required by the bond, the court say:

> "It is argued that the Institution for Savings cannot recover, being barred by its failure to do so," [give notice to surety] "and that therefore the Dunlap trustees are also barred. The bond explicitly provides, however, that the failure of one obligee to give notice 'shall not affect the rights of the other obligee.'"

In that case, it was also held that the bond was not avoided by the temporary default of the Main Street Corporation in the payment of the interest on the first mortgage to the Institution for Savings. While it is not expressly so stated, it is obvious that the surety was not prejudiced by such temporary default.

By point 6, plaintiff contends that the question of when the plaintiff first learned of any act or omission by Wilber that involved or might involve a loss under the surety bond was purely a question of fact which should have been submitted to the jury under proper instructions.

To this point, *American Surety Company v. Pauly,* supra, is cited. In that case plaintiff was the receiver of the California National Bank, having been appointed as such officer on December 18, 1891. The default constituting the basis for recovery from the surety was that of one O'Brien, who had been cashier of said bank. We learn from the opinion that upon certain issues in the case there was a decided conflict in the evidence

"particularly as to the time when the receiver first discovered that O'Brien, as cashier had committed an act that might involve a loss for which the surety company would be liable, and of which it was entitled to be notified in writing as soon as practicable after the occurrence of such act came to the knowledge of the bank."

*Outlook Farmers' Elevator Co. v. American Surety Co.,* supra, is also cited to point 6. From the quoted portion of the opinion in that case, it is apparent that there was a conflict in the testimony upon the question when the default of the principal was discovered by the obligee.

*Alabama Fidelity & Casualty Co. v. Alabama Fuel & Iron Co.,* 201 Ala. 625, 79 So. 57, is also cited to point 6. In that case, the question was whether by acquiescence the obligee had waived the right to recover for the default of the principal. The opinion indicates that differing deductions could have been derived from the testimony which consisted largely of correspondence between the parties and held that the question of acquiescence, consent or waiver was properly submitted for the jury's determination.

When the obligee discovered that the principal in the bond had committed acts which might cause loss would be a question for the jury if the evidence was

contradictory or of such a nature that differing conclusions, deductions or inferences could be drawn therefrom; but in the instant case the evidence is not disputed, nor can it be said that when plaintiff addressed its letter of August 24, 1942, to Wilber, plaintiff had not discovered acts of commission and omission on Wilber's part that might cause loss.

That being the state of evidence, the question when such discovery was made by plaintiff on Wilber's default was one upon which the trial court should and in effect did instruct the jury. *George A. Hormel & Co. v. American Bonding Co.,* 112 Minn. 288, 128 N. W. 12, 33 L. R. A. N. S. 513; and cases there cited. *Baker v. German Fire Ins. Co.* 124 Ind. 490, 24 N. E. 1041; *Employers' Liability Assur. Corp. v. Light, Heat & Power Co.,* 28 Ind. App. 437, 63 N. E. 54; *Dixon v. German Insurance Company of Freeport,* 11 Ky. Law Rep. (abstract) 1001; *Baker v. Metropolitan Casualty Ins. Co. of New York,* 118 Conn. 147, 171 A. 7, *Southern Surety Co. of New York v. Heyburn,* 234 Ky. 739, 29 S. W. 2d 6; *Western Automobile Casualty Co. v. Lee,* 246 Ky. 364, 55 S. W. 2d 1; *Greenwich Bank v. Hartford Fire Ins. Co.,* 250 N. Y. 116, 164 N. E. 876; *Stoyer v. Franklin Fire Ins. Co.* 114 Pa. Super. 555, 174 A. 628; *Metropolitan Life Ins. Co. v. Walton,* 19 Tenn. App. 59, 83 S. W. 2d 274; *Southern Home Ins. Co. of the Carolinas v. Bowers,* 157 Va. 686, 161 S. E. 914; *Hoffman v. Employer's Liability Assur. Corp.* 146 Or. 66, 29 P. 2d 557.

The authorities on this point are exhaustively cited in Vol. 7, A. L. R. p. 186, et seq. and in the 1943 Revision of the A. L. R. Blue Book of Supp. Decisions, at p. 68, and supplement No. 5 thereto p. 11, citing *Vande Leest v. Basten,* 241 Wis. 509, 6 N. W. (2d) 667.

The judgment of the circuit court is affirmed.